FRANCISCO ANDRÉS RAMOS ACOSTA y OTROS, demandantes y recurrentes, *v.* CAPARRA DAIRY, INC. y OTROS, demandados y recurridos.

*Número:* R-81-383     *Resuelto:* 20 de octubre de 1982

*Francisco Ponsa Feliú,* abogado de los recurrentes; *José A. Rivera Mercado,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

El 25 de febrero de 1978, ocurrió un accidente de tránsito en la calle U de la Urb. Ciudad Universitaria, de Río Piedras, Puerto Rico, en el cual murió un niño de seis años y ocho meses de edad, de nombre Francisco Andrés Ramos Jiménez, al ser arrollado por un camión de repartir leche, perteneciente a la co-demandada Caparra Dairy, Inc., el cual era conducido por Juan Reyes Guzmán, quien, al momento del accidente, se encontraba en funciones de su empleo como vendedor-repartidor de la referida Caparra Dairy, Inc. Se entabló la correspondiente demanda de daños y perjuicios, en donde figuran como demandantes el padre y la madre del menor fallecido y dos hermanos de padre de este último.

Celebrada la vista del caso en sus méritos, el Honorable Tribunal Superior de Puerto Rico, Sala de Carolina, dictó sentencia, mediante la cual declaró sin lugar la demanda radicada. La parte demandante recurrió ante este Tribunal en solicitud de revisión, imputándole al tribunal de instancia la supuesta comisión de cinco (5) errores. Decidimos revisar mediante resolución al efecto, del 15 de octubre de 1981.

En vista del resultado a que llegamos, entendemos procedente destacar que el resumen de la prueba que hacemos a continuación —sobre el aspecto de si hubo o no negligencia— surge de la exposición narrativa de la prueba

aprobada por el tribunal de instancia, que preparara *la propia parte demandada-recurrida.* (¹)

Para el sábado, 25 de febrero de 1978, ya hacía como siete a ocho años que Juan Reyes Guzmán trabajaba con la compañía Caparra Dairy, Inc. como vendedor-repartidor de leche. Ese día había comenzado sus labores regulares como a las 3:30 de la madrugada y como a eso de las 10:15 a 10:30 de la mañana se encontraba ya en la Calle U de la Urbanización Ciudad Universitaria, próximo a realizar su última entrega de leche del día en la casa del Lcdo. Héctor Varela Riestra, ruta y vecindario que conocía bien, ya que llevaba algún tiempo en dicha ruta. Juan, antes de ese día, había podido observar niños que jugaban en velocípedos y "automotocicletas" en las calles de dicha urbanización. El 25 de febrero de 1978, a pesar de ser un día sábado, en que los niños regularmente no tienen que ir a la escuela, no vio a ningún niño en la calle cerca de la residencia del licenciado Varela. Al llegar a la citada residencia, Juan ". . . estacionó el vehículo en dirección hacia el centro de la carretera, no alineado a la acera [debido a que así podía sacar] la leche haciendo juego con la marquesina del señor Varela . . . dejó el camión 'prendido', porque como estaba caminando todo el tiempo, si se apaga, después no prende". Juan se bajó del camión —no la guagua de repartir leche que estamos acostumbrados a ver— "por la parte donde se encuentra el guía, a la parte de atrás, de donde sacó los litros de leche". Terminada la transacción comercial en la casa del licenciado Varela, Juan *"se dirigió al truck, por la parte trasera, llegó*

---

(¹) La parte demandante-recurrente presentó el testimonio oral de: 1- Francisco Andrés Ramos Acosta, padre del menor fallecido; 2- Sonia Jiménez Colón, madre del niño; 3- Lcdo. Héctor M. Varela Riestra, vecino del lugar; 4- William Ruiz, tío del niño fallecido; 5- Iván Ramos, hermano del niño fallecido; 6- Migdalia García, ex-esposa del demandante Ramos Acosta y madre de la niña Verónica Ramos, hermana del niño fallecido; y 7- Juan Reyes Guzmán, chófer del camión.

La parte demandada-recurrida presentó el testimonio oral de los agentes Herminio Carrasquillo y Jorge Chapman, quienes habían sido anunciados como testigos por ambas partes.

*hasta el guía, quitó la emergencia, puso el cambio y avanzó; no había nada al frente que le obstruyese la visión, pues donde se sienta en el camión se ve hacia el frente".* (Énfasis suplido.) Aceptó Juan, en el juicio celebrado, que si hubiera habido un niño sentado en la calle al frente del camión no lo hubiera visto; no obstante ello, Juan *"puso el camión en un cambio, en primera por ser más potente; pero no había necesidad de mover el guía, porque ya estaba apuntando hacia la carretera; salió lentamente, arrancó y casi inmediatamente oyó un ruido* . . . . El camión caminó casi el largo del truck antes de sentir el ruido. (Las partes estipularon que eran algunos 25 a 30 pies)". (Énfasis suplido.) Después de oír el ruido, Juan detuvo el camión de inmediato, se bajó del mismo "por la puerta del guía, *caminó hacia atrás del camión porque de ahí provenía el ruido,* por el lado del guía no había nada; y cuando fue al otro lado, encontró al niño, pegado en las guaretas *traseras* derechas del camión, *frente a las guaretas"*. (Énfasis suplido.) Le fue imposible a Juan explicar durante el juicio cómo, si sólo condujo el camión hacia el frente, podía estar el niño *frente* a las gomas traseras derechas y no detrás de ellas. Al ver Juan al niño, como era de esperar, se afectó, "se puso en un estado crítico", gritó y llamó al licenciado Varela; éste vino enseguida; no había, al momento del accidente y en los segundos inmediatamente posteriores, ninguna otra persona allí.

El niño Francisco Andrés Ramos Jiménez, quien para el 25 de febrero de 1978 contaba seis años y ocho meses de edad y cursaba su primer grado de escuela, había pasado la noche del viernes 24 al sábado 25 de febrero en casa de sus tíos, William y Mary Ruiz, los cuales vivían en la Calle U de Ciudad Universitaria. Su madre, Sonia Jiménez Colón, llegó el sábado a casa de los Ruiz, con el propósito de recoger a Francisco Andrés, como a eso de las 9:00 de la mañana. Los padres de Francisco Andrés se habían divorciado y se acostumbraba que el niño se quedara en casa de sus tíos los viernes por la noche y que la madre lo recogiera

el sábado por la mañana. Ya dentro de la casa, la madre de Francisco Andrés comenzó a conversar con su amiga Mary Ruiz, mientras su hijo se entretenía jugando con los tres hijos de los Ruiz, de once, diez y seis años de edad, dentro y fuera de la casa, *ya que como la calle era una sin salida,* los niños acostumbraban a jugar en la acera; los niños entraban y salían de la casa continuamente; desde el lugar donde se encontraban las dos damas no se podía ver a los niños cuando estaban fuera de la casa. Pasada cerca de una hora, la madre de Francisco Andrés decidió irse, recogió las pertenencias de éste y, en esos momentos, oyó unos gritos de "un nene, un nene"; salió a la calle, vio a unas personas y un camión de la leche, oyó gritos de niños, vio el cuerpo del niño debajo del camión, *frente a las gomas,* y que el niño no tenía la mitad de la cabeza, se dio cuenta de que era su hijo, se retiró caminando hacia atrás, vio el "big wheel" del hijo como "pinchado" al frente del camión, entró a la casa; a los tres o cuatro minutos, llamó a su ex-esposo a la oficina; a éste le tomó de cinco a diez minutos en llegar al lugar, porque su oficina no quedaba lejos de allí; cuando vio a su ex-esposo por primera vez, éste tenía la camisa manchada de sangre.

El padre de Francisco Andrés se enteró del accidente cuando estaba en su oficina, por medio de una llamada telefónica de su ex-esposa; llegó al lugar en diez o quince minutos; al llegar, encontró el cuerpo atropellado de su hijo *frente a la goma trasera derecha del camión;* vio que estaba muerto, ni siquiera tenía ojos; lo levantó, se lo echó encima, cargándolo, hasta que un señor de la ambulancia se lo pidió, y le entregó el cuerpo de su hijo; pudo apreciar *manchas de sangre delante de la goma trasera derecha, desde la cabeza del hijo hasta la goma;* también vio un "big wheel" que se encontraba como encajado debajo del "bumper" delantero del camión; *sacó el "big wheel" y lo tiró en la marquesina de la casa;* un policía que llegó al sitio le preguntó lo que sabía; le explicó lo que había visto y había hecho; el policía le

ordenó que pusiera el "big wheel" en el sitio original donde lo había visto por primera vez y así lo hizo.

Herminio Carrasquillo es policía estatal adscrito a la División de Tránsito de la Policía de Puerto Rico; intervino en la investigación del accidente; fue primero al Hospital Municipal donde se encontraba el cadáver del niño; fue al lugar del accidente como a las 11:30 de la mañana; preguntó por testigos oculares y no encontró ninguno; vio el camión, *pudo observar sangre en la goma trasera del lado derecho al frente de la goma; detrás de la goma vio algo que él identificó como partículas de diente o de pelo, algo así;* frente al camión, al llegar, no vio nada; habló allí con el padre del niño y éste le explicó que había movido un "big wheel" del frente del camión a la marquesina; que le ordenó al padre que lo colocara como estaba frente al camión, que éste así lo hizo; al rato llegó el agente Chapman al lugar del accidente. Sometió el caso al fiscal, pero el mismo fue archivado porque no había testigos para acusar al conductor.

Jorge Chapman es agente de la Policía de Puerto Rico, perito en reconstrucción de escenas de crímenes y de accidentes. Llegó al lugar del accidente como de 12:30 a 1:00 de la tarde; vio el camión; *detrás del camión había lo que se conoce como masa encefálica; que delante de las llantas había una sustancia roja, gelatinosa, llamada sangre;* la llanta tenía sangre; *que determinó que "el vehículo no había sido movido en riversa [sic], pues le hubiese molido la cabeza también";* que el niño *"fue pillado, no aplastado";* que entiende que el camión *"no pasó por encima porque hubiera triturado la cabeza, y que lo que ocurrió fue que lo pilló e hizo una explosión";* que examinó el "big wheel" y que no encontró nada, el mismo estaba intacto y no tenía raspaduras, que no relacionaba al "big wheel" con el accidente. (Énfasis suplido.)

La autopsia en el cuerpo de Francisco Andrés fue llevada a cabo por un patólogo forense del Instituto de Medi-

cina Legal de Puerto Rico. El protocolo de autopsia fue ofrecido y admitido en evidencia. Del mismo surge lo siguiente:

*DIAGNÓSTICOS ANATÓMICOS:*

1. *Aplastamiento cráneo-facial.*
2. *Aplastamiento torácico que originó:*

    a). Extensas abrasiones con patrón definido de evidencias *de paso de una rueda de vehículo de motor.*
    b). Laceraciones *pulmonares izquierdas.*
    c). Hemotórax *izquierdo.*
    d). Contusión pulmonar *derecha.* (Énfasis suplido.)

En adición a lo anterior, surge de dicho protocolo de autopsia lo siguiente:

*EVIDENCIA DE TRAUMA:*

1. *Aplastamiento, destrucción y laceración de masa encefálica* que afecta de manera principal *toda la porción lateral izquierda de la cara y cráneo* a través de laceraciones en la región frontal y occipital sale masa encefálica y se ve interiormente *gran cantidad de huesos fracturados.* La bóveda izquierda está destruída [*sic*] y el globo ocular desorbitado.

2. Abrasiones-hematomas en "zig-zag" en disposición paralela entre sí y disposición vertical, *que afecta el cuello, región clavicular y región infraclavicular izquierda típicas de huellas dejadas por el paso de una goma de vehículo de motor.*

3. Extensa abrasión con *evidencia de aplastamiento* y huella de patrón dejada en forma de ondulada con abrasión y desaparición de todo el dermis superficial *que se extiende desde el cráneo hasta la región renal derecha y afecta parte de la región deltoidea y escápulo-deltoidea izquierda.*

4. Abrasión extensa a nivel de la región glútea derecha.

5. Abrasión pequeña a nivel del dorso de la mano y muñeca derechas.

6. *Área de abrasión a nivel de la rodilla derecha a cuyo nivel* evidenciamos una mancha negruzca compatible con grasa de vehículo de motor. (Énfasis suplido.)

Ante esa prueba, el tribunal de instancia determinó, como cuestión de hecho, que el accidente ocurrido fue "desgraciado". Concluyó, en adición, que el conductor había actuado como "un hombre prudente y razonable que no cometió acto alguno por el cual deba responsabilizarse", ya que nada había "en el área en que ocurrió el accidente, que le pudiera indicar a él la presencia de menores o que le requiriera tomar otras medidas y precauciones que las que tomó. . .". Estas conclusiones del tribunal de instancia están predicadas en el hecho de que dicho tribunal dio entero crédito a la declaración del conductor del camión, especialmente en cuanto a lo referente a que sólo había conducido el camión hacia el frente; "reforzado" dicho testimonio por el del agente Chapman, al cual también le dio crédito el tribunal, a los efectos de que el camión no le "pasó por encima" al menor.

Por último, expresó el tribunal de instancia que la parte demandante en un caso tiene la "obligación de poner al Tribunal en posición de resolver una controversia a su favor, estableciendo los hechos con preponderancia de prueba", y que "[s]i ofreciera una evidencia más débil, pudiendo haber ofrecido una más firme y satisfactoria, la evidencia así presentada [debía] mirarse con sospecha". [2]

■ Un examen sereno, desapasionado y minucioso nos convence de que las determinaciones antes señaladas que hiciera el tribunal de instancia no representan el balance más racional, justiciero y jurídico de la totalidad de la evidencia que desfilara ante dicho Tribunal y, por lo tanto, las mismas no pueden prevalecer. *Sanabria* v. *Sucn. González*, 82 D.P.R. 885 (1961); *Maryland Casualty Co.* v. *Quick Const.*

---

[2] Ello, refiriéndose a la situación de los testigos Herminio Carrasquillo y Jorge Chapman, ambos agentes de la Policía de Puerto Rico que participaron en la investigación del accidente y que, como dijéramos en el escolio núm. 1, habían sido anunciados como testigos por ambas partes, pero que, al no ser utilizados por la parte demandante-recurrente, fueron presentados por la parte demandada-recurrida.

*Corp.,* 90 D.P.R. 329 (1964); y *Abudo Servera* v. *A.T.P.R.,* 105 D.P.R. 728 (1977).

No somos dados a intervenir con frecuencia con las determinaciones de hecho que hace un tribunal de instancia y a sustituir nuestro criterio por el del juzgador ante quien declararon los testigos y quien tuvo la oportunidad de verlos declarar y apreciar su *demeanor.* Todavía más difícil es así hacerlo cuando, como en el presente caso, estamos conscientes de que el juez de instancia es competente, laborioso y responsable. Pero "[e]l arbitrio del juzgador de hechos es respetable, mas no es absoluto. Una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de este Tribunal". *Vda. de Morales* v. *De Jesús Toro,* 107 D.P.R. 826, 829 (1978).

El juez de instancia, como dijéramos, determinó que el accidente fue "desgraciado" y que el conductor del camión actuó como "un hombre prudente y razonable que no cometió acto alguno por el cual deba responsabilizarse", ya que nada había "en el área en que ocurrió el accidente, que le pudiera indicar a él la presencia de menores o que le requiriera tomar otras medidas y precauciones que las que tomó. . .".

Veamos si ello es correcto: de la propia declaración del conductor del camión surge que estaba familiarizado con la urbanización en que ocurre el accidente, ya que hacía algún tiempo estaba en esa ruta y que, con anterioridad a ese día, había visto niños que jugaban en esa calle en velocípedos y "automotocicletas" —aun cuando en ese día no había visto ninguno— por lo que tenía que estar alerta y pendiente a la posibilidad de que pudieran aparecer niños en dicha calle.

Ante esa situación, ¿qué hace dicho conductor una vez termina la transacción en la casa del licenciado Varela? En palabras de la propia demandada-recurrida: "se dirigió al truck, por la parte trasera, llegó hasta el guía, quitó la emergencia, puso el cambio y avanzó." Varias de las fotografías que fueron presentadas en evidencia demuestran

que dicho camión tenía, *a ambos* lados, un espejo retrovisor de un tamaño imponente. ¿En algún momento de su declaración expresa dicho conductor que hizo uso o miró por dichos espejos retrovisores? No, al contrario: dice dicho conductor que "puso el camión en un cambio, en primera por ser más potente, pero no había necesidad de mover el guía, porque ya estaba apuntando hacia la carretera; salió lentamente, arrancó y casi inmediatamente oyó un ruido". Demostrativo ello de que, en vista de que ni tenía que mover el guía, sólo miró para el frente y arrancó, sin mirar antes hacia los lados.

Hay un hecho del todo incontrovertible: el niño fallecido, en algún momento, se acercó o vino en contacto con el camión y fue arrollado. En qué preciso momento fue que el niño se acercó al camión, es lo que nadie puede precisar, por no haber testigos oculares. Pudo haber sido antes del chófer montarse en el camión; pudo haber sido en el intervalo de tiempo entre el momento del chófer montarse y arrancar el camión; pudo haber sido después que arrancó el camión; sólo Dios lo sabe. Lo que sí sabemos —por el propio testimonio del chófer— es que nunca miró; si hubiera mirado, quizás se hubiera evitado el accidente, quizás no. Lo cierto es que, poner un camión en movimiento en una urbanización donde usualmente juegan niños en la calle, un sábado, a las diez de la mañana, *sin antes mirar a los lados*, es un acto constitutivo de negligencia.

Es correcto que Juan Reyes Guzmán, como conductor de un vehículo de motor ese día 25 de febrero de 1978, no era un "garantizador absoluto" de la seguridad de los niños de Ciudad Universitaria; sin embargo, Juan Reyes Guzmán tenía conocimiento de que allí usualmente jugaban niños; ese conocimiento le exigía observar un mayor grado de cuidado del que observó. Véanse: *Álvarez* v. *Hernández*, 74 D.P.R. 493 (1953); *Figueroa* v. *Picó*, 69 D.P.R. 401 (1948).

La parte demandante-recurrente vehementemente argumenta ante nos —con el propósito de demostrar un ele-

mento adicional de negligencia— que la determinación del tribunal de instancia, a los efectos de que el conductor sólo manejó el camión "hacia el frente", es incorrecta —dicha determinación está basada en la declaración del chófer y del agente Chapman— y, en base a los hallazgos de la autopsia, alega que lo que en realidad ocurrió fue que el conductor manejó el camión hacia el frente, sintió un ruido al impactar por primera vez al menor, paró y, sin tomar precauciones, dio reversa, arrollando nuevamente al niño.

El "perito" Chapman concluye que el camión no había sido movido en reversa, pues de así haber ocurrido "le hubiese molido la cabeza"; que el niño "fue pillado no aplastado"; que el camión "no pasó por encima porque hubiera triturado la cabeza, y que lo que ocurrió fue que lo pilló e hizo una explosión".

Dicha "opinión pericial" se estrella contra los hallazgos que aparecen consignados en el protocolo de la autopsia que le fuera practicada al niño fallecido. Como pudimos notar anteriormente, el patólogo forense que practicó la autopsia certifica, como diagnósticos anatómicos, un *aplastamiento cráneo-facial* y un *aplastamiento torácico* con "extensas abrasiones *con patrón definido de evidencias de paso de una rueda de vehículo de motor".* Certificó dicho patólogo forense, como "evidencias de trauma", en síntesis, un *"aplastamiento, destrucción* y laceración de masa encefálica que afecta de manera principal *toda la porción lateral izquierda de la cara y cráneo . . .* y se ve [internamente] *gran cantidad de huesos fracturados. . . .* Abrasiones-hematomas en zig-zag . . . que afecta el cuello, región clavicular y región infraclavicular izquierda *típicas de huellas dejadas por el paso de una goma de vehículo de motor.* Extensa abrasión con evidencia de aplastamiento . . . que se extiende desde el cráneo hasta la región renal derecha y afecta parte de la región deltoidea y escápulo-deltoidea izquierda; y *área de abrasión a nivel de la rodilla derecha* a cuyo nivel evidenciamos una

mancha negruzca compatible con grasa de vehículo de motor". (Énfasis suplido.)

Todos los testigos en el caso están de acuerdo en un hecho: en que el cuerpo del niño, después de que el camión finalmente se detuvo, quedó *al frente* de las gomas derechas traseras; o sea, en el lado derecho del camión, entre las gomas traseras derechas y las gomas delanteras derechas. Las fotografías admitidas en evidencia, de hecho, muestran las "huellas de sangre", aproximadamente como a dos pies de las gomas traseras derechas. Todo ello tiende a indicar, con mayor razón, que en verdad el camión fue movido en reversa, pues como con tanto ahínco alega la parte demandante-recurrente ante nos, de haber sido conducido el camión sólo hacia el frente, lo lógico sería que el cuerpo del niño hubiera quedado detrás de las gomas traseras derechas y no al frente de ellas.

El problema con dicha inferencia es que realmente no podemos estar seguros de que así ocurrió; no tenemos el monopolio de la verdad y, por lo tanto, entendemos que no podemos determinar de un modo responsable, como cuestión de hecho, que es cierto que el camión se movió en reversa.

Ello, no obstante, es una indicación adicional de que la determinación del tribunal de instancia de que el accidente fue "desgraciado" y que el conductor del camión actuó como "un hombre prudente y razonable", no está de acuerdo con el balance más racional, justiciero y jurídico de la totalidad de la prueba y, por tanto, la misma no puede prevalecer. *Sanabria* v. *Sucn. González*, supra, pág. 995.

En cuanto al señalamiento hecho por el tribunal de instancia, a los efectos de que la prueba presentada por los demandantes debía mirarse con sospecha, por cuanto pudiendo presentar una evidencia más firme y satisfactoria presentaron una más débil, entendemos que dicho principio fue aplicado erróneamente a la particular situación de hechos que presenta el caso que nos ocupa.

Como dijéramos anteriormente, la parte demandante-recurrente presentó el testimonio oral de siete (7) testigos, incluso el de Juan Reyes Guzmán, chófer del camión, quien es la única persona que, en adición al menor arrollado, se encontraba en el sitio inmediato al momento del accidente. (3)

El tribunal de instancia hace el señalamiento antes reseñado, en relación con el hecho de que la parte demandante no presentó a los dos agentes de la Policía de Puerto Rico que intervinieron en la investigación del accidente, a pesar de haberlos anunciado como tales, siendo presentados por la parte demandada-recurrida. Entendemos que el testimonio del agente Jorge Chapman, en vista de lo expresado anteriormente, es uno de dudosa validez, y que no se puede penalizar a la parte demandante por no haberlo presentado como testigo. (4) En cuanto al testimonio del agente Herminio Carrasquillo, un examen del mismo demuestra que es uno de carácter acumulativo.

Por último, debemos determinar la responsabilidad, si alguna, de la co-demandante Sonia Jiménez Colón en relación con el accidente que dio lugar al presente caso. El tribunal de instancia determinó que: "Si alguien podía anticipar un riesgo por la conducta del menor, sólo podía hacerlo su señora madre y la Señora Ruíz, con quienes el menor se encontraba minutos antes."

Respecto a este punto, examinemos de nuevo las circunstancias: se trataba de un niño de seis años y ocho meses de edad; era un niño normal en su comportamiento, o sea, no se

---

(3) El chófer, Juan Reyes Guzmán, declaró que, al momento del accidente, pudo observar que no había ninguna otra persona en los alrededores.

(4) De hecho, la parte recurrente alega, en el recurso radicado ante nos, que el agente Chapman nunca examinó el cadáver del niño y que nunca tuvo ante sí el protocolo de autopsia, hecho que no ha negado la parte recurrida. De ser cierto, ese hecho lo descalificaría para actuar como "perito" en el caso, en relación con las opiniones que emitió durante el juicio. No hemos tomado en consideración la alegación a tales efectos, hecha por la parte recurrente, por ello no surgir oficialmente de los autos del caso.

trataba de un niño "anormalmente" travieso o inquieto; que estaba jugando en compañía de otros niños entre los que se encontraba uno de once años de edad; que la madre, aun cuando desde el sitio en que se encontraba en la casa no podía ver al niño en los momentos en que éste estaba en el exterior, lo vio en varias ocasiones al éste entrar y salir de la casa; que esto ocurrió durante un intervalo de tiempo aproximado de cuarenta y cinco minutos a una hora; y que se trataba de una calle sin salida donde los niños acostumbraban a jugar en la acera.

¿Fue negligente la co-demandante Sonia Jiménez Colón?

Es cierto que en el Puerto Rico en que vivimos hoy día es usual ver niños de corta edad jugando en las aceras —y hasta en las calles— de las muchas áreas residenciales que se han construido en nuestra Isla, en la forma y manera en que jugaba el menor fallecido. Quizás ello se deba a que las residencias que se construyen en estos días, debido a los altos costos, tienen poco terreno donde los niños pueden correr y jugar libres de peligro con los juguetes modernos, tales como los "big wheels".[5]

El que ello sea usual y corriente, sin embargo, no significa, a nuestra manera de ver las cosas, que una madre permita que esto suceda, sin ejercer un mayor grado de cuidado y supervisión que el que ejerció la co-demandante Sonia Jiménez Colón en el presente caso. Su hijo estuvo sin la supervisión directa de ella por espacio de cuarenta y cinco minutos, aproximadamente. Ello conlleva peligros indescriptibles, pues los niños gozan de una imaginación extraordinaria que los lleva a exponerse a situaciones como la del presente caso. Entendemos que la referida co-demandante fue negligente en un treinta por ciento, el cual sólo es aplicable a ella en particular. Véase: *Torres Pérez* v. *Medina Torres*, 113 D.P.R. 72 (1982).

---

[5] Esa "práctica", dicho sea de paso, impone a los automovilistas el ejercicio de una mayor precaución en el mundo de hoy día.

Por las razones antes expresadas, *se revoca la sentencia dictada por el Honorable Tribunal Superior de Puerto Rico, Sala de Carolina, en el Caso Civil Núm. 80-550, mediante la cual declaró sin lugar la demanda de daños y perjuicios radicada en dicho caso y, en su lugar, se dicta sentencia que declara con lugar la referida demanda. Se devuelve el caso al tribunal de instancia para que éste, conforme la prueba de daños desfilada ante dicho tribunal, determine las sumas de dinero que deben ser concedidas a los demandantes.*

Los Jueces Asociados Señores Dávila, Torres Rigual y Negrón García concurren en el resultado sin opinión.