# 2008 DTA 64

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE SAN JUAN/HUMACAO**
**PANEL V**

PORFIRIO FRANCESCHI, ANGELA FRANCESCHI Y LA
SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS
Apelantes

v.

PEDRO G. RODRÍGUEZ CARRASQUILLO, ZULMA LEDUC ARZÓN Y
LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS
Apelados

Núm. KLAN-2007-00535

San Juan, Puerto Rico, a 28 de abril de 2008

Panel integrado por su Presidente, el Juez Arbona Lago,
el Juez Salas Soler y la Juez Velázquez Cajigas

Velázquez Cajigas, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

La parte apelante, esposos Franceschi, presentó un recurso de Apelación el 26 de abril de 2007 en el cual solicita que se revoque la Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI), el 18 de diciembre de 2006 y notificada el 4 de enero de 2007. El pleito gira en torno a un contrato de opción de compra que indica como prima la suma de $1,500.00. Sin embargo, el cheque entregado al propietario de la propiedad fue por $5,000.00. Resolvió el TPI que los $5,000.00 fueron dados como prima y que por ello, el apelado, Pedro Rodríguez Carrasquillo, no estaba obligado a devolver el dinero cuando los apelantes decidieron no comprar la casa en el término de cuarenta y cinco (45) días que disponía el contrato.

Por los fundamentos que exponemos más adelante, se revoca la Sentencia del 18 de diciembre de 2006.

### I

Los esposos Franceschi firmaron un contrato de opción de compra con el señor Rodríguez el 18 de octubre de 2002. El señor Rodríguez era el dueño de la propiedad objeto del contrato. Las cláusulas del referido contrato de opción de compra indican que el término para ejercer la opción sería de cuarenta y cinco (45) días, contados a partir del otorgamiento del mismo. La propiedad estaba valorada en $150,000.00. Las cláusulas B y C disponían que:

*"(B) "LOS COMPRADORES" [esposos Francecshi] en este acto entrega a "LOS PROPIETARIOS" [esposos Rodríguez] la prima de $1,500.00, la cual será acreditada al precio de venta si la operación de compraventa se verificare dentro del término de esta Opción.*

*(C) Si no se verificase la compraventa dentro del término de esta Opción, "LOS PROPIETARIOS" retendrán la suma total pagada por esa Opción y su prórroga."*

El día en que se otorgó el contrato los esposos Franceschi entregaron un cheque de $5,000.00 al señor Rodríguez. El mencionado cheque expresaba en la parte inferior izquierda las palabras *"Depósito Compra Casa"*. El señor Rodríguez redactó y firmó un recibo fechado *"10/18/02"* que lee como sigue:

*"Recivo [sic] depósito Compraventa.*

*Yo Pedro G. Rodríguez Carrasquillo, SSN # ..., reciví [sic] del Sr. Porfirio Franceschi cheque #749 por la cantidad de $5,000.00 por concepto de opción de compra casa en Villa Nevárez en la calle 10 #1020."*

Pasadas varias semanas, los esposos Franceschi llamaron al señor Rodríguez para informarle que no comprarían la casa. Dicha notificación fue durante los cuarenta y cinco (45) días siguientes a la fecha de otorgamiento del contrato. Los señores Franceschi deseaban que el señor Rodríguez le devolviera los $5,000.00 que habían entregado el 18 de octubre de 2002, a lo que respondió en la negativa.

Los esposos Franceschi presentaron una demanda en contra del señor Rodríguez y su esposa el 27 de enero de 2003 con el propósito de que le devolvieran los $5,000.00 entregados al señor Rodríguez. En adición a esto, alegaron angustias mentales y materiales estimadas en $10,000.00. Las partes presentaron mociones de sentencia sumaria que llevaron al TPI a dictar una sentencia parcial el 4 de agosto de 2005. En la misma se resolvió que el contrato efectuado por las partes era uno de opción de compra y que según las cláusulas del mismo, de no llevarse a cabo la compraventa el dueño de la propiedad se quedaría con el dinero entregado como prima. Por esto, el TPI decidió que la suma de $1,500.00 no debía ser devuelta, sin embargo, el caso debía continuar en relación a los restantes $3,500.00. Debido a un acuerdo entre las partes durante el juicio, el TPI enmendó la Sentencia Parcial *"nunc pro tunc"* para corregir que el contrato fue otorgado el 18 de octubre de 2002 y no el 24 de julio de 2002 como lee al final del mismo. [1]

Finalmente, el TPI dictó Sentencia el 18 de diciembre de 2006 y resolvió que el señor Rodríguez no debía devolver los $5,000.00 porque, de acuerdo a la prueba presentada, dicho dinero fue dado en concepto de opción y no como un préstamo personal. Añadió el T.P.I., que de acuerdo con el contrato de opción, el dueño no tenía que devolver el dinero de la opción si los esposos Franceschi decidían no comprar. No se presentó prueba en cuanto a los sufrimientos y angustias mentales, por lo que esta causa de acción fue desestimada.

Inconforme con esta decisión, acuden ante este Tribunal los esposos Franceschi y alegan que:

*"ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DECLARAR LA DEMANDA INTERPUESTA NO HA LUGAR EN VISTA DE QUE SURGE PLENAMENTE DE LA PRUEBA DESFILADA QUE EL DEMANDANTE OPTÓ DENTRO DEL TÉRMINO DEL CONTRATO DE OPCIÓN EN NO ADQUIRIR LA PROPIEDAD EN VENTA, POR LO QUE LE CORRESPONDE LA DEVOLUCIÓN INTEGRA DEL DINERO ENTREGADO EN TAL CONCEPTO.*

*EN SU DEFECTO...*

*ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DECLARAR QUE EL DINERO ENTREGADO EN EXCESO A LA CANTIDAD CLARAMENTE ESTIPULADA EN EL CONTRATO CORRESPONDÍA IGUALMENTE A LA OPCIÓN Y NO A UN PRÉSTAMO PERSONAL COMO SURGE DE LA PRUEBA."*

El 17 de agosto de 2007, este Tribunal ordenó a la parte apelada a presentar su oposición al alegato de los esposos Francesehi. Hasta el momento, y pasados mucho más de los treinta (30) días que se otorgaron, no se ha recibido dicha oposición, por lo que procedemos a resolver el caso sin la misma.

## II

### A. Aspectos Generales de los Contratos

De acuerdo con nuestro ordenamiento jurídico, *"las partes son libres para acordar y contratar todo lo que a bien les parezca, siempre que ello no sea contrario a la ley, la moral o el orden público"*. *Vélez López v. Izquierdo Stella,* 162 D.P.R. 88 (2004); Art. 1207 del Código Civil, 31 L.P.R.A. §3372. El Tribunal Supremo

también expone que: *"[c]ónsono con la autonomía de la voluntad contractual, hemos resuelto que los contratos son ley entre las partes, las cuales tienen que acatar lo estipulado, a menos que sea contrario a la ley, la moral o el orden público." Id; Banco Bilbao Vizcaya v. Mun. Vega Baja*, 154 D.P.R. 53 (2001); *Trinidad v. Chade*, 153 D.P.R. 280 (2001). Una vez perfeccionado un contrato, las partes quedan obligadas al cumplimiento de lo expresamente pactado y a las consecuencias que de él se deriven, conforme a la buena fe, al uso y a la ley. *Vélez López v. Izquierdo Stella, supra;* Art. 1210, 1230 y 1213 del Código Civil de Puerto Rico, 31 L.P.R.A. § 3375, 3391 y 3451.

El Artículo 1213 del Código Civil de Puerto Rico, 31 L.P.R.A. §3391, dispone que para que un contrato sea válido tienen que concurrir tres elementos: consentimiento, objeto y causa. Los contratos existen desde que una persona consiente en obligarse respecto de otra u otras, a dar algo o prestar algún servicio. 31 L.P.R.A. §3371. *"Los contratos se perfeccionan por el mero consentimiento, y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley"*. 31 L.P.R.A. §3375.

## B. Contrato de Opción de Compra

En cuanto al contrato de opción de compra, el Tribunal Supremo expresó que:

*"El contrato de opción de compra no está regulado por el Código Civil, pero hemos reconocido su existencia en esta jurisdicción. Se trata de un contrato consensual, mediante el cual una parte (promitente) le concede a otra parte (optante) el derecho exclusivo a decidir de manera unilateral si comprará determinado bien inmueble que le pertenece al promitente. Esta facultad tendrá que ejercitarse dentro de un período de tiempo definido por las partes, y tanto el promitente como el optante se beneficiarán con el negocio. En realidad se trata de un contrato preparatorio o precontrato encaminado al eventual otorgamiento de un contrato de compra y venta. Los elementos esenciales del mismo son los siguientes: (1) se concede al optante la facultad de decidir unilateralmente si celebrará el contrato principal (la compra y venta) sin ninguna obligación por parte de éste; (2) dicha concesión tiene carácter de exclusividad; (3) se establece un plazo para ejercitar la opción; y (4) no existe otra condición que no sea la voluntad del optante. De los anteriores elementos podemos colegir que, a pesar de ser un contrato consensual, la opción de compra es un contrato unilateral, porque el optante no está obligado a comprar, contrario al caso del promitente que sí está obligado a venderle al primero, si aquél así lo decide." Irizarry López v. García Cámara*, 155 D.P.R. 713 (2001).

## C. Interpretación de los Contratos

Los contratos tienen fuerza de ley entre las partes, por lo que tienen que cumplir con lo acordado siempre que no se viole la ley, la moral o el orden público. *Irizarry López v. García Cámara, supra.* En cuanto a la interpretación el Tribunal Supremo ha expresado que:

*"Sin embargo, algunos contratos requieren un ejercicio de interpretación para poder determinar la naturaleza de la obligación en que incurrieron las partes. Por esta razón, el Código Civil de Puerto Rico establece unas disposiciones para la interpretación de los contratos. (op. cit.)* **La primera regla establece que se debe atender el texto claro de sus cláusulas, cuando las mismas reflejan claramente la intención de las partes.** *A esos efectos, el Artículo 1233 del Código Civil (op. cit.) dispone lo siguiente:*

**"Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas.**

*Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésa sobre aquéllas. (Énfasis en el original)*

*La disposición estatutaria antes citada ha sido utilizada por esta Curia en la interpretación de contratos, de cuya letra clara surge la voluntad de las partes sin duda alguna. (Op. cit.) En Marcial v. Tomé, (op. cit.), reconocimos que se debe seguir la letra clara del contrato, cuando la misma refleje inequívocamente la voluntad de las partes. A pesar de lo dispuesto en esta disposición estatutaria, hay ocasiones en que no es posible determinar la voluntad de los contratantes con la mera lectura literal de las cláusulas contractuales. Por eso, el Código Civil dispone, en su Artículo 1234 (op. cit.), que **se podrá juzgar la voluntad de los contratantes por sus actos anteriores, coetáneos y posteriores a la perfección del mismo.** En repetidas ocasiones hemos reconocido la utilidad de tales criterios para interpretar los contratos. (Op. cit.) Sin embargo, **al momento de interpretar un contrato es preciso presuponer lealtad, corrección y buena fe en su redacción, e interpretarlo de manera tal que lleve a resultados conformes a la relación contractual y que estén de acuerdo con las normas éticas. Dicho en otras palabras, no se puede buscar oscuridad ni tergiversar la interpretación de los contratos para llegar a resultados absurdos o injustos."* (Op. cit.) (Énfasis nuestro) *Id.*

A su vez, el Artículo 1235 del Código Civil, 31 L.P.R.A. §3473, dispone que no deberán entenderse comprendidos en el contrato cosas distintas y casos diferentes de aquéllos que los interesados se propusieron contratar. Aquellas cláusulas que admitan diversos sentidos deberán interpretarse dando lugar a aquél que sea más adecuado para que produzca efecto. 31 L.P.R.A. §3474. Es decir, la interpretación tiene que considerar la intención de las partes, al igual que tiene que ser cónsona con el principio de la buena fe. La interpretación no puede llevar a resultados incorrectos, absurdos e injustos. *Irizarry López v. García Cámara, supra.*

## D. Novación Modificativa

En nuestro ordenamiento jurídico existen dos modalidades de la novación: la extintiva y la modificativa. La figura de la novación extintiva es una de las causas mediante las cuales se puede extinguir una obligación. Art. 1110 del Código Civil de Puerto Rico, 31 L.P.R.A. §3151. Sin embargo, no siempre el efecto de una novación es extintivo, sino que puede ser meramente modificativo, **manteniéndose de forma íntegra la obligación original y subsistiendo de tal forma las garantías accesorias de la misma.** *Miranda Soto v. Mena Eró*, 109 D.P.R. 473 (1980). El Artículo 1157 del Código Civil, 31 L.P.R.A. §3241, establece que existen tres formas de modificar las obligaciones: (1) **variando su objeto o sus condiciones principales**; (2) sustituyendo la persona del deudor; o (3) subrogando a un tercero en los derechos del acreedor.

No existe una regla inflexible que sirva para determinar cuándo nos encontramos ante la alteración de una condición principal o de una accesoria, para efectos de poder concluir si un cambio en algún término o condición de un contrato implica una novación modificativa o una extintiva. Por tal razón, el Tribunal Supremo ha resuelto que la novación **es siempre una cuestión de intención, la cual debe inferirse de las circunstancias particulares de cada caso.** *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378 (1973).

Se han establecido las siguientes pautas interpretativas con relación a esta figura jurídica: (1) la novación nunca se presume y ha de ser **acreditada sin género alguno de duda**; (2) que la novación es siempre cuestión de intención y que ésta debe inferirse de las circunstancias que rodean cada caso en particular; (3) que la doctrina puntualiza el elemento de la voluntad de las partes como determinante de la novación; y (4) que la extinción de las obligaciones conlleva la extinción de las garantías y demás derechos accesorios. Resulta evidente que una consecuencia tan drástica como ésta sólo puede producirse cuando las partes han tenido clara conciencia de ello. *Constructora Bauzá Inc. v. García López*, 129 DPR 579, 598 (1992), citando a *Warner Lambert Co. v. Tribunal Superior, supra.*

## E. Deferencia en cuanto a apreciación de la prueba

Si de un examen sereno, desapasionado y minucioso nos convencemos de que las determinaciones de hechos que hiciere el T.P.I. no representan el balance más racional, las mismas no pueden prevalecer. *Ramos*

*Acosta v. Caparra Dairy, Inc.*, 113 D.P.R. 357 (1982). Una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora del tribunal de jurisdicción apelativa. *Vda. de Morales v. De Jesús Toro,* 107 D.P.R. 826 (1978). En cuanto a la apreciación de la prueba documental, el tribunal apelativo está en las mismas condiciones que el T.P.I. *Culebra Enterprises, Corp. v. E. L. A.,* 143 D.P.R. 935 (1997); *Ortiz v. Cruz Pabón*, 103 D.P.R. 939 (1975).

De la propia declaración de los demandantes-apelantes surge lo poco familiarizados que estaban con los conceptos de opción de compraventa, diferente al apelado, quien había mercadeado previamente con la casa objeto del contrato de opción de compra y quien asumió una postura de dilación sobre la producción de la escritura a su favor que lo acreditaba como dueño de la propiedad.

Citamos de la transcripción de la prueba oral parte del testimonio del testigo Porfirio Franceschi Rodríguez:

*"P ¿Reconoce el documento que se le ha entregado?*

*R Sí, licenciado.*

*P ¿Sobre qué versa ese documento?*

*R Bueno, este documento se basa en el día que estuvimos el 18 de octubre de 2002 en la vecindad de la casa que íbamos mi señora y yo a ver con opción de comprar. Ella había hablado por teléfono con el señor Rodríguez y estuvimos mirando la casa y cuando hablamos de dar cierta cantidad de dinero de opción, pues eran mil quinientos pero el señor Rodríguez me dijo si podía dar un poco más de dinero. La cuestión es que yo le dije a mi señora, "Bueno, si estamos de acuerdo en lo que has visto de momento, pues yo voy..." Porque nosotros estábamos viviendo en esa misma calle, en un apartamento, fui al apartamento y con mi señora, hicimos un cheque y regresamos esa misma tarde y le hicimos entrega del cheque al señor Rodríguez, el cual nos dio un recibo.*

*P ¿O sea, que es un contrato de opción de compra?*

*R Exacto.*

*P Si puede leer de la segunda página la Cláusula B.*

*R La Cláusula B, sí. Bueno, ahí dice, "Mil quinientos dólares" pero le entregamos...*

*P La puede leer completa la Cláusula B.*

*R Dice, "Los compradores en este acto entregan a los propietarios la suma de mil quinientos dólares, la cual será acreditada al precio de venta si la operación de compraventa se verificara dentro del término de esta opción".*

*P Por lo que para el contrato de opción de compra según indica la cláusula era mil quinientos dólares solamente.*

*R Sí, señor.*

*P Eso es correcto. Señor Porfirio, ¿usted puede identificar su firma en el documento?*

*R Sí, se encuentra en la parte derecha inferior de la página donde dice "los compradores", está mi firma y la*

*de mi señora.*

*P Porfirio, si la opción de compra se otorgó por mil quinientos dólares, ¿porqué usted le entrega al demandado un cheque por la cantidad de cinco mil dólares?*

*HONORABLE JUEZ: No se ha desfilado prueba sobre eso, compañero, todavía.*

*Lcdo. Fuentes: Bueno, perdone, ya el testigo testificó sobre el cheque, perdone por la cantidad...*

*Lcdo. Fuentes (cont.):*

*P Perdone, doctor. ¿La cantidad por la cual hizo el cheque que le entregó al demandado, me puede indicar la cantidad?*

*R Cinco mil dólares.*

*P Cinco mil dólares. Ahora le pregunto porqué le entrega un cheque por una cantidad superior a la que indica el contrato de opción de compra.*

*R Porque el vendedor me solicitó si podía entregarle más cantidad de lo que se decía, que era mil quinientos, y llegamos a un acuerdo de que yo podría entregarle...*

*P Y le pregunto, ¿porqué no se renegocio el contrato de opción de compra para incluir la cantidad de cinco mil dólares?*

*R Esa pregunta yo no sé contestarla.*

*P Porque lo cierto es que la cantidad del contrato es mil quinientos dólares solamente.*

*R Exacto.*

*P ¿Es correcto?*

*R Sí.*

*P Okey.*

*R Ahí fue error mío."*

### III

En el presente caso no existe controversia en cuanto a que los esposos Franceschi ejercieron su derecho de negarse a comprar la casa, lo que en este tipo de negocio jurídico significa que decidieron no ejercer el derecho de opción, dentro del término de cuarenta y cinco (45) días que disponía el contrato. Es por ello, que los $1,500.00 no están en controversia, ya que según las cláusulas del contrato el propietario podía retener ese dinero si los esposos Franceschi decidieran no proceder a comprar la casa. Ahora bien, la controversia gira en torno a si los $3,500.00 restantes fueron entregados en concepto de opción de compra o como mero adelanto o préstamo personal, según alegan los apelantes.

El señor Rodríguez expresó en la vista celebrada el 3 de noviembre de 2006 ante el TPI que los esposos Franceschi le dieron los $5,000.00 como prima de la opción de compraventa. Añadió que la razón por la cual el

contrato indicaba que la prima era de $1,500.00 fue porque era un contrato anteriormente utilizado al cual le cambió los nombres. Por su parte, los apelantes Franceshi alegan que los $5,000.00 fueron entregados en concepto de depósito para la compra de la casa. Además de esto, en la vista del 3 de noviembre de 2006 indicaron que se entregó una cantidad superior a la mencionada en el contrato debido a que el señor Rodríguez les expresó que si podían entregaran más dinero.

El cheque tiene una nota que dice: *"Depósito compra casa"*. La parte superior del recibo lee *"Recibo Depósito Compraventa"*. Sin embargo, el recibo también expresa que los $5,000.00 son en concepto de opción de compra. De igual forma, el contrato de opción dispone en su cláusula (B) que la prima es de $1,500.00. Ante esta situación que presenta incongruencia entre las disposiciones contractuales y las acciones alegadamente realizadas por las partes, es preciso atender la cláusula contractual según la intención de las partes.

De acuerdo con la jurisprudencia antes mencionada, la primera regla sobre interpretación establece que se debe atender el texto claro de sus cláusulas, cuando las mismas reflejan claramente la intención de las partes. *Irizarry López v. García Cámara, supra.* Al momento de interpretar un contrato es preciso presuponer lealtad, corrección y buena fe en su redacción, e interpretarlo de manera tal que lleve a resultados conformes a la relación contractual y que estén de acuerdo con las normas éticas. La voluntad de los contratantes se puede evaluar de acuerdo a las acciones realizadas antes, durante y luego de efectuarse el contrato. *Id.*

La cláusula (B) del contrato de opción otorgado entre las partes, apelante y apelada, es clara y específica en cuanto a la prima. El contrato de opción fue arreglado para incluir los nombres correctos de las partes, sin embargo, la prima no fue cambiada. La frase *"depósito de compra"* no indica que la intención de las partes es que el precio de la opción sea de $5,000.00, sino que se está dando un depósito para la compra de la casa de $3,500.00, además, de $1,500.00 como precio por optar. Al no efectuarse la compraventa porque los optantes no ejercitaron la opción, corresponde la devolución de los $3,500.00 que no era precio de opción. Las acciones realizadas antes, durante y después de efectuado el contrato no demuestran que la intención de las partes fuera entregar los $5,000.00 en concepto de precio de opción, sino que los $1,500.00 era el costo de la opción y la suma de dinero restante era un depósito o adelanto para la compraventa futura de la casa, lo que no se dio.

Consideramos pertinente citar de la transcripción de la prueba oral el siguiente segmento, testimonio de Ángela Franceschi Castillo:

*"P En el momento del 18 de octubre de 2002 se otorga este contrato de opción compra porque me imagino que hay un interés de adquirir la propiedad. ¿Eso es cierto o no?*

*R Sí, señor.*

*P Ángela, en el testimonio de Porfirio en varios momentos él indicó que usted sabía más del caso. Si puede darnos más detalles sobre los incidentes del otorgamiento y posterior a ese día, si nos puede hablar un poquito más, con más detalles.*

*R Entiendo que sí. Después de mi esposo haber entregado ese mes un cheque de cinco mil dólares para opción de compra por una casa al señor Pedro Rodríguez, mi esposo le informa que él tiene que trabajar y yo como esposa voy a hacer el favor de ir al banco y hacerle las solicitaciones...*

*P Una pequeña interrupción, Ángela. ¿La opción de compra, porqué cantidad indica el contrato que se hizo la opción de compra?*

*R De mil quinientos dólares.*

P    ¿Mil quinientos dólares?

R    Unjú.

P    ¿Ese es el precio de la opción de compra, no es correcto?

R    Unjú.

P    Okey, continúe.

HONORABLE JUEZ: Licenciado, ambos abogados, con permiso, testigo. (Conversación en el estrado.) Vamos adelante.

Lcdo. Fuentes (cont.):

P    Ángela, si nos puede leer la Cláusula A del contrato de opción de compra.

HONORABLE JUEZ: No que nos la pueda leer, abogado, por favor, que la lea ella para refrescarse.

Lcdo. Fuentes (cont.):

P    Si puede leer la Cláusula A del contrato para refrescar la memoria.

R    "Los propietarios confieren a los compradores un contrato de opción de compra sobre la referida propiedad por el término de cuarenta y cinco días calendarios a partir de esta fecha por un precio de ciento cincuenta mil dólares".

P    Le pregunta, Ángela, ¿dentro de ese término de cuarenta y cinco días hubo alguna comunicación entre usted y el demandado?

R    Sí.

P    Sí, si me permite.

R    Claro.

P    Desde el momento que se le entregó el cheque, los cinco mil dólares por la opción de la compra y la casa, vuelvo y repito, mi esposo me pregunta si yo puedo hacerle gestiones que él no puede hacer por el trabajo. Y claramente él, verdad, porque estamos interesados en la compra los dos. Me decidí ir al banco a solicitar un préstamo para...a nombre de mi esposo y yo. Fui hablé con el personal del departamento de préstamos y después de un momento, un buen rato, él me da una lista de los documentos que yo tengo que entregar, o tenemos que entregar los dos para proseguir con este préstamo.

Me fui a la casa, le entregué la lista que me dio el señor a mi esposo, la leímos y en una de ella decía que tenemos que incluir la copia de la propiedad que se estaba vendiendo a través del señor vendedor y nosotros compradores. Traté de llamar al señor y lo conseguí después de varias llamadas y le expliqué que necesitaba ese papel. El dijo que sí, que lo iba a traer.

Después de varios días vino y me dio el papel. Yo tomé el papel, el día siguiente fui al banco y le entregué los papeles que me habían requerido... que ellos requerían. Cuando le entrego los papeles al señor, él los mira

y me.... Y me dice, *"¿Y dónde están los demás?"* Y yo le dije, *"¿Cuáles demás? Esto fue lo que se me entregó"*. Y me dice, *"Esto no es lo que se requiere en el banco"*. En ese momento no tenía idea, esta persona no tenía idea de que él estaba hablando. Y yo le dije, *"Eso fue lo que el señor me entregó y eso es. Y entonces me dice, Esto no es. Dígale al señor que me tiene que traer, me tiene usted que traer la copia entera de la propiedad"*. Porque solamente estaba la parte de atrás, la fotocopia de la parte de atrás de la propiedad del señor. Yo le dije que perdonara, pero que iba a llamar al señor de nuevo. Así lo hice con mucha dificultad porque fue muy dificultoso encontrarlo a él cada vez que se llamaba.

*Finalmente le dije...lo encontré y le dije lo que estaba pasando. El me dijo, "Sí está bien, se lo voy a traer, pero no sé porqué el banco le está dando problemas porque esto es lo que se necesita". Y que a mí me iban a dar problemas los bancos y que así eran los bancos de Puerto Rico.*

*Claro, en ese momento yo no sé a qué el se refiere. El me dijo, "Okey, le voy a traer los papeles". Pero pasaron los días, pasaron como cuatro o cinco días y no llegaba el papel. Yo estaba preocupada porque había ido al banco a solicitar un préstamo y yo no me estaba presentando el papel que me requerían. Fui al banco directamente al decirle a la persona que no tenía los papeles que me pedían, que el señor no me los había entregado. Para mi sorpresa, el señor me dice, "El señor lo trajo". Cuando él me dice que el señor le llevó los papeles me extraño y me sorprendió porque soy esta persona Ángela Franceschi y Porfirio Franceschi los que están solicitando un préstamo, no es el señor vendedor. Me dijo, "Aquí están". Y yo le dije, "Me sorprende, gracias". Hablé con él y me fui para mi casa.*

*Al llegar a casa le expliqué a mi esposo lo que estaba pasando, lo que pasó y me dijo, "Esto no es correcto. ¿Por qué no me llama a mí si yo le llamé a él para que me entregara el papel, por qué no me lo entregó a mi?" Esa fue una de las causas que me decepcionó a mi y a mi esposo, con otras más que el señor después de eso fue un...se le...Perdón, antes de, se le solicitó que nos demostrara la casa de día para verla, pero él decía que después de las cinco o seis porque él estaba trabajando.*

*Y en una ocasión fuimos a verla cuando se estaba hablando en la propiedad a él se le preguntó cuántos cuartos tiene la casa y él dijo tres cuartos, tres recámaras. Cuando él la mostró una tarde, una noche, era bien oscuro que estaba, noté que no habían tres recámaras. Le hice la pregunta un momento después y él me dice, "¡Ah!, pero la otra recámara fue convertida en comedor". Entonces no son tres recámaras.*

*Pasando, pasando varios acontecimientos de llamadas para allá y para acá, fue tan desagradable, ya la ilusión de comprar una casa se nos fue porque estábamos notando que la persona que creíamos que era...que estaba vendiendo una propiedad verdaderamente pues..."*

La Sentencia del TPI hace referencia a que el señor Franceschi por ser médico de profesión debe estar familiarizado con las obligaciones que surgen de un contrato. De igual forma debe estarlo el señor Rodríguez, ya que hizo alusión a que no era la primera vez que participaba en un contrato de opción de compra. Asimismo las partes deben reconocer que las cláusulas de un contrato son la ley entre las partes siempre y cuando no sean contrarias a la ley, la moral o el orden público. Si la prima correcta no era de $1,500.00 debió corregirla como lo hizo con los nombres de las partes. Tampoco debió expedir un recibo titulado *"Recibo Depósito Compraventa"* si era por opción de compra. Además de esto, el Código Civil en su Artículo 2, 31 L.P.R.A. §2, dispone que *"[l]a ignorancia de las leyes no excusa de su cumplimiento"*.

Un cambio en la cantidad de la prima objeto del contrato produce una novación modificativa, ya que se está variando un elemento accesorio del contrato, pero la obligación original sigue siendo la misma. Para hacer una modificación del contrato es preciso que ambas partes tengan la intención de que ese cambio se realice y que no exista duda en cuanto a que esa es la voluntad de las partes. En el presente caso no está claro que la intención de las partes haya sido modificar la prima de $1,500 a $5,000, por lo que no puede decirse que se realizó una

novación modificativa.

Por otro lado y conforme al Artículo 1240 del Código Civil, 31 L.P.R.A. §3478, las cláusulas oscuras o ambiguas deben ser interpretadas en contra de la parte que redactó el contrato. *González v. Coop. de Seguros de Vida de P.R.,* 117 D.P.R. 659 (1986); *Ulpiano Casal Inc. v. Totty Manufacturing Corp.,* 90 D.P.R. 739, 744 (1964). El señor Rodríguez fue quien preparó el contrato de opción con $1,500.00 y el recibo escrito de los $5,000.00, más recibió el cheque por dicha cantidad que expresa el concepto de *"depósito de compra casa"*; de considerarse como una cláusula ambigua, la misma debe ser interpretada a favor de los esposos Franceschi.

Es por todo esto que se revoca la Sentencia del 18 de diciembre de 2006 y se ordena al señor Rodríguez a devolver a los esposos Franceschi los $3,500.00 que fueron entregados como depósito o anticipo para la compra de la casa.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.

María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones

**ESCOLIO 2008 DTA 64**

**1.** En la parte superior de la primera página del contrato se indica una fecha sin mes, pero con día 18. Las partes aclararon esta situación durante el juicio y estipularon que la fecha correcta era 18 de octubre de 2002.