ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
TRIBUNAL DE APELACIONES
**PANEL ESPECIAL**

| | | |
|---|---|---|
| **SALVIO TORRES CARDONA; YOLANDA JUSTINIANO SOSA Y LA SOCIEDAD DE BIENES GANANCIALES COMPUESTA POR AMBOS; SALVIO D. TORRES JUSTINIANO; ANTONIO ZAPATA BERRÍOS; LIRIO DEL MAR TORRES JUSTINIANO Y LA SOCIEDAD DE BIENES GANANCIALES COMPUESTA POR AMBOS** DEMANDANTE(S)-APELANTE(S)  V.  **MIGUEL BELTRÁN SÁNCHEZ; IVETTE BELTRÁN QUINTANA Y LA SOCIEDAD DE BIENES GANANCIALES COMPUESTA POR AMBOS; ASEGURADORAS "X", "Y" Y "Z"** DEMANDADA(S)-APELADA(S) | **KLAN202300265** | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de **AGUADA**  Caso Núm. **ABCI201800523 (0002)**  Sobre: Daños y Perjuicios; Resolución de Contrato y Daños |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Juez Barresi Ramos y la Juez Domínguez Irizarry.[1]

*Barresi Ramos*, juez ponente

### SENTENCIA

En San Juan, Puerto Rico, hoy día 17 de junio de 2025.

Comparecen ante este Tribunal de Apelaciones, el señor **SALVIO TORRES CARDONA; YOLANDA JUSTINIANO SOSA Y LA SOCIEDAD DE BIENES GANANCIALES COMPUESTA POR AMBOS; SALVIO D. TORRES JUSTINIANO; ANTONIO ZAPATA BERRÍOS; LIRIO DEL MAR TORRES JUSTINIANO Y LA SOCIEDAD DE BIENES GANANCIALES COMPUESTA POR AMBOS** (el señor **TORRES CARDONA Y OTROS**) mediante un *Escrito de Apelación* incoado el 3 de abril de 2023. En su

---

[1] En virtud de la *Orden Administrativa OATA-2025-019* de 10 de febrero de 2025, la Jueza Domínguez Irizarry sustituyó a la Jueza Rivera Pérez quien cesó de ejercer funciones en el Tribunal de Apelaciones.

recurso, nos solicitan que revisemos la *Sentencia Enmendada* emitida el 1 de marzo de 2023 por el Tribunal de Primera Instancia (TPI), Sala Superior de Aguada.[2] Mediante el aludido dictamen, el foro primario declaró no ha lugar la *Demanda* instada por el señor **TORRES CARDONA Y OTROS**.

Exponemos el trasfondo fáctico y procesal que acompañan a la presente controversia.

- I -

El 14 de marzo de 2018, el señor **TORRES CARDONA Y OTROS** entablaron una *Demanda* sobre daños y perjuicios por la muerte ilegal (*"wrongful death"*) de RICARDO AGUSTÍN TORRES JUSTINIANO (RICARDO AGUSTÍN QEPD), quien falleció el 19 de febrero de 2015, como desenlace de un accidente de aviación en el municipio de Rincón, Puerto Rico.[3] Alegaron que ello se debió a la negligencia del señor **MIGUEL BELTRÁN SÁNCHEZ** (señor **BELTRÁN SÁNCHEZ**) al no haber inspeccionado y/o brindado el debido mantenimiento al avión, resultando así en problemas con el filtro de la gasolina.[4] En virtud de lo anterior, solicitaron la resolución del contrato de compraventa mediante el cual el señor **ANTONIO ZAPATA BERRÍOS** (señor **ZAPATA BERRÍOS**) adquirió la aeronave identificada como Rans S-6ES Coyote II/N5196W, por la suma de $13,600.00 que fueron desembolsados de la siguiente manera: $12,000.00 en efectivo, y el restante mediante el valor de una cámara de video *Canon*, valorada en $1,600.00).[5]

Surge de la *Demanda*, que el día de los hechos, el señor **ZAPATA BERRÍOS** se dirigió al aeropuerto Eugenio María de Hostos en Mayagüez, con el interés de comprar la avioneta antes descrita. Posteriormente, al llegar el señor **BELTRÁN SÁNCHEZ**, realizaron un "pre flight check" y ulteriormente

---

[2] Este dictamen judicial fue notificado y archivado en autos el 6 de marzo de 2023. Apéndice del *Escrito de Apelación*, págs. 176- 190.

[3] *Íd.*, págs. 1- 13. El 29 de enero de 2016, el señor **TORRES CARDONA Y OTROS** cursaron una misiva, dirigida al señor **BELTRÁN SÁNCHEZ,** presentando su reclamación extrajudicial con el propósito de interrumpir el término prescriptivo de un (1) año dispuesto el Código Civil de Puerto Rico de 1930. La *Demanda* fue enmendada el 28 de marzo de 2018, a los efectos de incluir a las compañías aseguradoras.

[4] El señor **BELTRÁN SÁNCHEZ** era el dueño registral ("registered owner") del avión.

[5] Al momento de los hechos, el señor **ZAPATA BERRÍOS** poseía licencia privada de piloto expedida por la "Federal Aviation Administration" (FAA) con clasificación ("rating") para pilotar aviones de un motor ("airplane single engine land").

procedieron al vuelo de prueba que duró aproximadamente quince (15) o veinte (20) minutos.[6] Al culminar el vuelo de prueba, el señor ZAPATA BERRÍOS se convenció de mercar el avión y le pagó al señor BELTRÁN SÁNCHEZ la suma total acordada. Concluida la negociación, el señor ZAPATA BERRÍOS recibió una llamada de RICARDO AGUSTÍN, su cuñado, a quien invitó al aeropuerto para que lo acompañara a un vuelo corto para probar la nave. Para ello, compró la gasolina necesaria para abordar y esperó por RICARDO AGUSTÍN.

Al llegar RICARDO AGUSTÍN, ambos abordaron el avión y el señor ZAPATA BERRÍOS verificó la válvula de la gasolina. Más tarde, dirigió la aeronave por la pista hasta el momento en que despegó y alcanzó una altura aproximada de 1,000 pies. Después de elevarse y estabilizarse en el aire, procedió a acercarse hacia el área de Rincón. Mientras se encontraban volando por espacio de aproximadamente veinte (20) minutos, el señor ZAPATA BERRÍOS se percató que el motor del avión no estaba produciendo la fuerza suficiente para mantenerse volando. En ese momento, realizó intentos para solucionar el problema ("*troubleshooting*") mientras trazaba un curso de vuelo paralelo a la playa sobrevolando aguas de poca profundidad.

El señor ZAPATA BERRÍOS no logró aterrizar en la arena debido a que había personas en la playa y la superficie en la arena era rocosa, por lo que, optó por aterrizar en el agua. Al aterrizar, el avión desaceleró y se hundió. Como secuela, el señor ZAPATA BERRÍOS soltó su cinturón de seguridad y nadó hacia la superficie. Una vez logró subir, se percató que RICARDO AGUSTÍN no se encontraba en sus alrededores. Nadó devuelta al aeroplano, le soltó su cinturón y lo llevó hasta la superficie. Desafortunadamente, al llegar a la superficie, ya RICARDO AGUSTÍN no estaba respirando.[7]

---

[6] Del testimonio del señor BELTRÁN SÁNCHEZ, se desprende que éste admitió que realizó los "*pre flight checks*" del avión previo a realizar el vuelo de prueba.

[7] En ese momento, había llegado al lugar una persona en una tabla ("*boogie board*"), colocaron a RICARDO AGUSTÍN en ella y lo llevaron a la arena de la playa en donde realizaron esfuerzos para resucitarlo, los cuales fueron infructuosos.

Más tarde, el 22 de mayo de 2018, el señor **BELTRÁN SÁNCHEZ** presentó su *Contestación a Demanda* conteniendo sus defensas afirmativas.[8] En síntesis, negó la mayoría de las alegaciones contenidas en la *Demanda* y puntualizó que: (1) el vuelo que efectuó el señor **ZAPATA BERRÍOS** fue ilegal, de conformidad con las disposiciones del *Code of Federal Regulations* (CFR); (2) la muerte de RICARDO AGUSTÍN se debió a la ilegalidad, culpa e inexperiencia del señor **ZAPATA BERRÍOS**, responsable del vuelo; y (3) se trataba de negligencia imputada, toda vez que de la autopsia surgió que RICARDO AGUSTÍN ingería ciertos medicamentos que le impidieron reaccionar a la emergencia cuando se sumergieron en el agua.

El 12 de abril de 2021, las partes presentaron el *Informe Preliminar entre Abogados*.[9] Luego de varios trámites procesales, los días 25, 26 y 27 de agosto, y 13 de septiembre de 2021, se celebraron las audiencias mediante videoconferencia.[10] El 25 de agosto de 2021, testificaron los señores Luis A. Irizarry Porrata, perito de **TORRES CARDONA Y OTROS,** y **ZAPATA BERRÍOS**.[11] Al otro día, el 26 de agosto de 2021, atestiguaron los señores Gerardo Torres, perito del señor **BELTRÁN SÁNCHEZ Y OTROS,** y José Amin Torres González, perito instructor de "Sport Pilot Repairman Aircraft".[12] El 27 de agosto de 2021, declararon los señores **BELTRÁN SÁNCHEZ**, Luis Gerardo Gaud y Roberto Colón Mercado.[13] Finalmente, el 13 de septiembre de 2021, atestó el señor Félix Cruz, quedando el caso sometido a la consideración del tribunal apelado.[14]

Entonces, el 22 de diciembre de 2022, el señor **TORRES CARDONA Y OTROS** presentaron un *Memorando de Hechos Probados*, en el cual

---

[8] Véase *Apéndice* del *Escrito de Apelación*, págs. 32- 36.
[9] *Íd*., págs. 77- 105.
[10] Entre algunos de los trámites pertinentes al caso, se encuentran los siguientes: el 11 de octubre de 2018, se celebró una *Conferencia Inicial*; el 24 de enero de 2018, la *Conferencia con Antelación al Juicio*; el 30 de mayo de 2019, una nueva *Conferencia con Antelación al Juicio*. Asimismo, el 5 de agosto de 2019, *se formuló Sentencia* a los efectos de decretar el archivo administrativo del procedimiento contra el señor **BELTRÁN SÁNCHEZ Y OTROS**, sin perjuicio, toda vez que se acogieron a los beneficios de la Ley Federal de Quiebras. Posteriormente, el 7 de febrero de 2020, se reabrió el pleito. Véase *Apéndice* del *Escrito de Apelación*, págs. 37- 76.
[11] *Íd*., págs. 109- 111.
[12] *Íd*., págs. 112- 113.
[13] *Íd.*, págs. 114- 115.
[14] *Íd.*, pág. 116.

incluyeron la prueba documental marcada como "prueba conjunta" en las audiencias celebradas; una relación de hechos pertinentes; y un resumen de los testimonios presentados.[15]

Consecuentemente, el 25 de enero de 2023, se dictaminó la *Sentencia* declarando no ha lugar la *Demanda*.[16] Coligió que el percance aéreo que resultó en el fallecimiento de RICARDO AGUSTÍN se debió a las propias acciones u omisiones del señor **TORRES CARDONA Y OTROS**, sin haber mediado negligencia por parte del señor **BELTRÁN SÁNCHEZ Y OTROS**; el señor **ZAPATA BERRÍOS** tuvo la oportunidad de inspeccionar y volar el avión horas antes del fatal accidente y conocía o debió haber conocido las condiciones del filtro de gasolina, pues este se encontraba visible, en los pies, al dorso izquierdo del piloto; el señor **ZAPATA BERRÍOS** no logró demostrar que las recomendaciones del manufacturero sobre el mantenimiento del avión eran mandatorias para un avión experimental; tampoco estableció que el filtro de gasolina estuviese contaminado antes de despegar el avión; y no probaron que la referida contaminación no fuera producto de que el avión llevaba tres (3) días sumergido bajo el mar cuando se recuperó.[17]

Inconforme, el 10 de febrero de 2023, el señor **TORRES CARDONA Y OTROS** presentaron *Solicitud de Determinaciones de Hechos Adicionales y Moci[ó]n de Reconsideraci[ó]n a Tenor con las Reglas 43 y 47 de Procedimiento*

---

[15] Apéndice del *Escrito de Apelación*, págs. 118- 131.

[16] *Íd.*, págs. 132- 146.

[17] La prueba documental estipulada en conjunto fue la siguiente: (1) Informe Médico Forense (PAT-0862-15) y toxicológico del occiso **RICARDO AGUSTÍN TORRES JUSTINIANO**; (2) NTSB Factual Report del accidente #ERA15LA133 con documentos de entrevistas y otros anejos (incluye 20 fotos del avión tomadas por la FAA; facturas; páginas de logbooks; etc.); (3) Récords del avión accidentado; (4) Pilot logbook de **ANTONIO ZAPATA BERRÍOS**; (5) Aircraft logbook del avión accidentado (N5196W); (6) Engine logbook del avión accidentado (N5196W); (7) Maintenance logbook del avión accidentado (N5196W); (8) Certificado de defunción de **RICARDO AGUSTÍN TORRES JUSTINIANO**; (9) Certificado de nacimiento de **LIRIO DEL MAR TORRES JUSTINIANO**; (10) Certificado de nacimiento de **SALVIO DAVID TORRES JUSTINIANO**; (11) Certificado de matrimonio de **LIRIO DEL MAR TORRES JUSTINIANO** y **ANTONIO ZAPATA BERRÍOS**; (12) Certificado de matrimonio de **SALVIO TORRES CARDONA** y **YOLANDA JUSTINIANO SOSA**; (13) Licencia private pilot expedida por FAA a **ANTONIO ZAPATA BERRÍOS**; (14) Medical Certificate Third Class expedida por la FAA a **ANTONIO ZAPATA BERRÍOS** 09/08/2014; (15) Licencia de piloto Sports Pilot de **MIGUEL BELTRÁN**; (16) Special Airworthiness Certificate del avión accidentado; (17) Certified Blue Ribbon copy de la investigación del Departamento de Transportación de los Estados Unidos del avión accidentado; (18) Entrada de Engine Log 01/20/2013 con 721.7 hrs.; (19) 14 CFR Chapter I, Subchapter F Part 91.327; y (20) 14 CFR Chapter 1, Subchapter F Part 43.3.

*Civil.*[18] Interpelaron que se enmendaran las determinaciones de hechos de la *Sentencia* para añadir ciertos hechos que, a su consideración, eran pertinentes a la controversia; y suplicaron la reconsideración, toda vez que aseguraron que lograron probar que el accidente ocurrió por la culpa y la negligencia del señor **BELTRÁN SÁNCHEZ,** quien, como dueño y operador del aeroplano, sabía y/o debió saber que el mismo no estaba en condiciones para volar el 19 de febrero de 2015. A continuación, el 1 de marzo de 2023, se decretó *Resolución* declarando no ha lugar la *Solicitud de Reconsideración* y ha lugar parcialmente la *Solicitud de Determinaciones de Hechos y Conclusiones de Derecho Adicionales* presentada por el señor **TORRES CARDONA Y OTROS.**[19] En la misma fecha, se determinó la *Sentencia Enmendada* apelada en la cual se formularon las siguientes determinaciones de hechos:

1. El señor Miguel Beltrán Sánchez era el dueño registral de un avión identificado como Rans S– 6ES Coyote II/N5196W. Este avión es de tipo experimental, fue manufacturado en 1994, es de 2 asientos, núm. de serie 0492265, modelo 2, con motor Rotax 582.
2. En la tarde del 19 de febrero de 2015, el codemandante Antonio Zapata compró el referido avión del codemandado, Sr. Miguel Beltrán, en el aeropuerto de Mayagüez, P.R.
3. El precio de compraventa fue de $12,000.00 en efectivo y una cámara de video Cannon valorada en $1,600.00, para un total de $13,600.00.
4. Para esa fecha, el señor Zapata contaba con una licencia privada de piloto expedida por la Federal Aviation Administration (FAA) con rating para pilotar aviones de una hélice ("airplane single engine land").
5. La transacción de compraventa se dio, luego de un vuelo de prueba que realizaran el demandante y el demandado.
6. El codemandante Zapata declaró que, antes de despegar, le realizó varias preguntas al señor Beltrán sobre cómo funcionaba el radio Garmin del avión y como se encendía el avión. También testificó que el señor Beltrán no le dijo en ese momento que el avión tenía una bomba de gasolina, la cual hubiese encendido durante el vuelo si hubiese sabido que el avión contaba con esta.
7. El demandante estableció que llegó 2 horas antes al aeropuerto y que inspeccionó la nave antes de volar.
8. El demandado también declaró que, como piloto, verificó la nave antes de hacer el vuelo de prueba. Luego de alrededor de 15– 20 minutos de vuelo, volvieron al aeropuerto.
9. Luego del referido vuelo de prueba, el demandante recibió una llamada de su cuñado, el fenecido Ricardo Agustín Torres Justiniano, a quien le dijo para hacer un vuelo juntos.

---

[18] Apéndice del *Escrito de Apelación,* págs. 147- 164.
[19] *Íd.*, págs. 165- 175.

10. Posteriormente, el codemandante Zapata salió del aeropuerto, compró gasolina premium de automóvil y procedió a echársela al avión.

11. El demandante declaró que, durante el vuelo hacia el oeste con su cuñado, el avión comenzó a perder fuerza pasados unos 15 a 20 minutos por el área de Rincón. Por lo cual, intentó virar para llegar al aeropuerto de Mayagüez. Añadió que el avión empezó a bajar de altura porque no tenía fuerza el motor, pero luego cuando el avión estaba más o menos a 75 pies de altura volvió a coger fuerza de nuevo. Posteriormente, tuvo que hacer un aterrizaje de emergencia.

12. El demandante declaró que escogió aterrizar el avión como a 100 pies de la orilla, en el mar entre Rincón y Añasco y que salió nadando. Lamentablemente, su cuñado no pudo salir del avión accidentado, el cual se sumergió y como consecuencia de esto, su cuñado falleció ahogado.

13. Para el aterrizaje en el mar, el codemandante Zapata utilizó los "flaps" del avión para ir lo más lento posible al momento del aterrizaje. El avión aterrizó en el agua sin voltearse ("flip over"), pero al ser alas de tela se hundió rápidamente.

14. El codemandante Zapata testificó que una vez se hundió el avión se quitó el cinturón de seguridad, abrió la puerta y salió. Entonces, miró hacia el lado derecho, pero no vio a su cuñado. Por lo cual, procedió a nadar por encima del avión, para entrar a este y sacarlo. Posteriormente, procedió a nadar con el hacia la orilla.

15. El codemandante siguió testificando que un muchacho en "morey boggie board" lo asistió y cogió a su cuñado, a quien puso de espaldas en la tabla y lo llevó hasta la arena. Una vez llegaron a la orilla, el codemandante empezó a darle primeros auxilios al señor [Torres] Justiniano, incluyendo "CPR" y oxígeno con la boca. Sin embargo, a los cinco minutos, el señor Torres Justiniano no respondía.

16. Surge del informe de autopsia del Instituto de Ciencias Forenses, que el señor Ricardo Agustín Torres Justiniano falleció por ahogamiento.

17. El señor Luis A. Irizarry Porrata, quien fue cualificado por el tribunal como perito en investigación y reconstrucción de accidentes aéreos de la parte demandante, testificó que el piloto Zapata no fue un factor en el accidente y que actuó razonablemente dentro de las circunstancias. Expresó que las condiciones del tiempo tampoco fueron un factor en el accidente, según su investigación.

18. La Federal Aviation Administration (FAA) investigó al codemandante Zapata con relación al accidente aéreo, pero no tomó acción administrativa en su contra. Tampoco suspendió o [revocó] su licencia.

19. El perito de la parte demandante, Sr. Irizarry Porrata, declaró que, [a] base a su experiencia, si la FAA hubiese determinado que el piloto incurrió en negligencia o se desvió de las mejores prácticas al pilotar la nave, hubiera radicado sanciones y hubiera suspendido o revocado la licencia de piloto, pero esto no ocurrió.

20. El perito Irizarry Porrata opinó que el señor Zapata actuó razonablemente porque el avión sufrió una pérdida de potencia al no llegarle gasolina al motor. Expresó que, debido a dicha situación, el piloto tuvo que tomar unas acciones para poder aterrizar el avión, debido a que no pudo recobrar la potencia del motor en un área sin hacerle daño o peligro a otras personas.

21. El perito Irizarry Porrata opinó que el señor Zapata aterrizó el avión en el agua, luego de observar que había gente en la playa

y que había rocas cerca de la orilla. Declaró que, de haber actuado de otra manera, se hubiese afectado la vida o seguridad de las personas que se encontraban en el área.

22. Es la opinión del perito Irizarry Porrata, que la pérdida o potencia que sufrió el avión se debió a que no le llegaba gasolina al motor.

23. En específico, el perito sostuvo que el filtro de gasolina estaba contaminado, lo cual surgía de la inspección que la FAA realizó [al] avión y que estaba contenida en el Informe Factual del NTSB. Este incluye las fotos tomadas por los inspectores del NTSB.

24. El perito Irizarry Porrata testificó que la contaminación que se detectó en el filtro de la gasolina era compatible con el tipo de químico que se crea en los tanques de gasolina de dicho avión por la condensación y por el tipo de combustible que utiliza este tipo de avión; que es una mezcla de gasolina y aceite. En adición, declaró que esa misma contaminación puede detectarse cuando inspeccionó los tanques de gasolina del avión que tenían unas marcas consistentes con dicha contaminación. Entonces, el efecto de la contaminación encontrada en el filtro de la gasolina del avión es que bloquea el [flujo] de gasolina al motor.

25. El perito Irizarry Porrata opinó que la pérdida de potencia que sufrió el avión concordaba con la condición en que se encontraron las hélices del avión luego del accidente. Sobre este particular, testificó que cuando una hélice está dando vueltas en el motor y produce potencia, estas se viran o se doblan cuando caen al agua como consecuencia del impacto. Ahora bien, el perito testificó que estas no estaban dobladas, lo cual en su opinión era consistente con la entrevista que le realizó al codemandante Zapata durante su investigación.

26. El perito Irizarry testificó que las fotos que obtuvo de la FAA y del NTSB reflejaban que el filtro de la gasolina conectado desde los tanques al motor estaba contaminado, pues se veía ennegrecido. Era su opinión que esto reflejaba que el filtro no había sido cambiado o inspeccionado en bastante tiempo.

27. El perito Irizarry Porrata testificó que el Manual de Mantenimiento del manufacturero del motor (Rotax) del avión accidentado establece y requiere que se coteje la condición del filtro de gasolina del motor cada veinticinco (25) horas de uso y que se reemplace el filtro cada cien (100) horas.

28. El informe factual del NTSB, indica lo siguiente: "The Rotax Maintenance Manual also stated, "check engine suspension frequently as well as the drive components, fuel lines, wiring, and fuel and air filters". The maintenance schedule required that the fuel filter be checked every 25, 50, and 75 hours of operation and be replaced every 100 hours of operation. Section 11.8, "Check and Replacement of Fuel Filter" stated, "the flow through the filter may be restricted due to long term buildup of dirt. A more serious type of blockage, which can occur quite rapidly is caused by a reaction between detergents in certain two– stroke oils and water in the fuel. Both types of blockages may be difficult to detect visually. If blockage is suspected, renew fuel filter or filter element. Subsequently, avoid water contamination of fuel". Examination of the airplane and engine maintenance records did not find any entries related to the fuel filter.

29. El perito Irizarry Porrata testificó que él también examinó los libros de mantenimiento del avión y del motor, pero no encontró entradas que establecieran que el filtro de la gasolina se remplazó en noviembre de 2014.

30. El informe factual del NTSB, indica lo siguiente: "Based on the engine serial number, the engine was manufactured on April 17, 2018. The Rotax Maintenance Manual (Section 10.2–Maintenance Schedule) stated that the general overhaul of the engine should be carried out every 5 years, or every 300 hundred hours, whichever comes first. Maintenance records did not indicate that the engine had been overhauled since its installation in 2009".

31. El perito Irizarry Porrata testificó que de los récords de mantenimiento del avión accidentado se desprendía una entrada del 20 de abril de 2009, la cual indicaba que se instaló un motor nuevo en esa fecha.

32. Asimismo, indicó que de los récords de mantenimiento del avión no surgía que se le hubiese hecho el "overhaul" al motor en el 2014, cinco (5) años después de que fue instalado.

33. El perito Irizarry Porrata opinó que, [a] base a la inspección de los récords que este llevó a cabo, los récords del avión accidentado no estaban bien mantenidos porque, entre otras cosas, no había entradas de las inspecciones y no había entradas de ningún tipo de reparación o alteración que se hubiera hecho en el avión. Esto, a pesar de que, en su experiencia, luego de que un avión volara por 135 horas, se encontraba discrepancias para reparar.

34. También testificó que las regulaciones requieren que se realice una entrada en los libros sobre cuál fue el trabajo que se realizó y en los libros no aparecía nada al respecto, simplemente un "release" para que el avión volviera a volar.

35. El testigo de los demandados, Sr. José Amid Torres, también admitió que los libros y récords de mantenimiento del avión accidentado no estaban bien mantenidos porque, entre otras cosas, se le hicieron alteraciones en la tela, el "cowling", se cambiaron las mangas de gasolina y pintaron el avión después de que el señor Beltrán adquiriera el mismo.

36. El señor Torres admitió que ninguno de esos cambios y alteraciones estaba documentado en los libros de mantenimiento del avión y que eso constituía una violación de la reglamentación. También admitió que luego de hacérseles estos cambios al avión había que hacerle un "weight and balance" antes de darle el "release" para volar y en los récords de mantenimiento tampoco surgía de que se hubiese hecho el "weight and balance.

37. El perito Irizarry Porrata testificó que de la investigación y revisión de los libros de mantenimiento del avión accidentado se desprende que el 11/26/2014 se le hizo una inspección anual al avión accidentado, que al momento en que se realizó la inspección anual en noviembre de 2014 habían transcurrido 13 meses y el avión había volado 135 horas desde la última inspección anual, por lo que también se había excedido por 35 horas de vuelo antes de realizar dicha inspección.

38. El perito Irizarry Porrata testificó que no surgía de los libros de mantenimiento del avión accidentado que, durante la inspección anual realizada en noviembre de 2014, se hubiese cambiado el filtro de la gasolina.

39. El perito Irizarry Porrata testificó que no encontró evidencia en los libros de mantenimiento que indicara que el filtro de gasolina fue reemplazado o verificado después de la inspección del 26 de noviembre del 2014 y, antes del día del accidente en febrero del 2015.

40. A preguntas del abogado, el perito Irizarry declaró que la obligación de mantener los récords de mantenimiento de un avión era del operador o dueño de la nave y que, según su

investigación, los récords del avión accidentado no estaban bien mantenidos.

41. Durante el contrainterrogatorio, el codemandado Beltrán admitió que volar un avión que ha acumulado más de 100 horas sin inspección, constituye una violación de la reglamentación.

42. El señor Félix Cruz Despiau fue el mecánico que realizó la inspección anual de la nave accidentada en noviembre de 2014. En su testimonio directo, el señor Cruz Despiau testificó que el "Schedule" de mantenimiento de Rotax no establecía que había que reemplazar el filtro de la gasolina cada 100 horas de uso.

43. Durante el interrogatorio directo, el señor Cruz Despiau testificó que, durante dicha inspección anual el 26 de noviembre de 2014, el "filtro [de la gasolina] se le cambió, es decir, se le puso un filtro nuevo". Sin embargo, no fue [él] quien instaló el filtro nuevo.

44. El señor Cruz Despiau admitió durante el contrainterrogatorio que no tenía conocimiento de la entrada en los libros de mantenimiento del avión accidentado.

45. Según los libros de mantenimiento del avión accidentado, el último reemplazo que se hizo al filtro de la gasolina fue durante la inspección anual practicada en octubre de 2013.

46. El perito Irizarry Porrata opinó que el avión accidentado sufrió daños menores cuando aterrizó en el agua.

47. Conforme al testimonio del perito Irizarry Porrata y a los hallazgos de su investigación, el avión voló aproximadamente 17.7 horas desde la inspección del avión, el 26 de noviembre de 2014, a la fecha del accidente, el 19 de febrero de 2015.

48. El perito Irizarry Porrata opinó que, [a] base de su experiencia, el filtro de la gasolina del avión no hubiese reflejado la contaminación que se encontró durante la investigación con 17.7 horas de vuelo. Concluyó entonces que el filtro de la gasolina no era nuevo porque el grado de contaminación que se observó en este era incompatible con las horas de vuelo que mostraban los récords del avión desde la inspección del 26 de noviembre de 2014 hasta la fecha del accidente.

49. El perito Irizarry Porrata opinó, a preguntas del abogado, que la causa probable del accidente fue la falta de gasolina al motor, debido a la contaminación que tenía el filtro que no le permitía el paso de la gasolina libremente.

50. El señor Antonio Zapata fue dueño de un avión Rans S12 de 2005 al 2007. También fue dueño de un avión Cessna 172 de 2014 al 2017.

51. El señor Zapata acumuló aproximadamente 450 horas de vuelo en el Rans S12 durante el tiempo que tuvo la nave. El mismo preparaba la mezcla de combustible siguiendo una tabla y las instrucciones del manufacturero.

52. El codemandante Zapata testificó que el avión Rans S12 es similar, pero no idéntico al avión accidentado. A preguntas de su abogado, el testigo especificó que ambos aviones tenían el mismo motor marca Rotax y utilizaban el mismo combustible que era una mezcla de gasolina y aceite.

En desacuerdo, el 3 de abril de 2023, el señor **TORRES CARDONA Y**

**OTROS** acudieron ante este Tribunal de Apelaciones mediante *Escrito de*

*Apelación* señalando la comisión del(de los) siguiente(s) error(es):

El TPI incurrió en un manifiesto error en la apreciación de la prueba documental estipulada por las partes ya que descartó sin base racional alguna los hallazgos del informe factual rendido por la National Transportation Safety Board ("NTSB"), cuyo informe establece que de la investigación del accidente realizada por el NTSB se determinó que el filtro de la gasolina del avión accidentado estaba contaminado ("filter was clogged").

Erró y/o abusó de su discreción el TPI [e]/o incurrió en un error manifiesto al descartar sin justificación ni base racional alguna la opinión pericial del perito Luis Irizarry Porrata, quien fue el [ú]nico perito cualificado en el campo de investigación y reconstrucción de accidentes de aviación que testificó en el juicio, y quien concluyó que la causa probable del accidente fuero[n] las omisiones negligentes del demandado Miguel Beltr[á]n S[á]nchez al incumplir sus obligaciones como due[ñ]o (owner) del avión accidentado de mantener el avi[ó]n en condiciones aptas ("airworthy") para volar.

El TPI erró y/o abusó de su discreción [e]/o incurrió en un error manifiesto en la apreciación de la prueba al concluir que el accidente de aviación ocurrió por la negligencia y/o las omisiones negligentes del demandante Antonio Zapata.

El 13 de abril de 2023, intimamos *Resolución* en la cual concedimos un término de treinta (30) días al señor **BELTRÁN SÁNCHEZ Y OTROS** para presentar su alegato en oposición. Asimismo, el 19 de abril de 2023, prescribimos *Resolución* disponiendo los procedimientos de la reproducción de la transcripción de la prueba oral (TPO). En cumplimiento, el 15 de mayo de 2023, el señor **TORRES CARDONA Y OTROS** presentaron *Moción Presentando Transcripciones de la Prueba Oral e Informativa*.

Luego de una prórroga, el 9 de junio de 2023, el señor **BELTRÁN SÁNCHEZ Y OTROS** presentaron su *Escrito por Propio Derecho en Cumplimiento de Resolu[ción] Presentando Alegato en Oposici[ó]n a Esc[r]ito de Apelaci[ó]n*. Acogida la transcripción de la prueba oral (TPO), el 20 de junio de 2023, el señor **TORRES CARDONA Y OTROS** presentaron su *Alegato Suplementario de los Apelantes*. Del mismo modo, el 31 de julio de 2023, el señor **BELTRÁN SÁNCHEZ Y OTROS** presentaron su *Alegato Suplementario de la Parte Apelada*.

Toda vez que el(los) error(es) señalado(s) por el señor **TORRES CARDONA Y OTROS** van enfocados a cuestionar la suficiencia de la evidencia o prueba desfilada, a continuación, incluimos un resumen de los testimonios brindados ante el Tribunal de Primera Instancia y que hemos examinado con

sumo cuidado.

### Testimonio del señor Luis Alberto Irizarry Porrata

El señor Irizarry Porrata, cualificado como perito en el área de investigación y reconstrucción de accidentes de aviación, relató que desde el año 1984 cuenta con una oficina de consultoría de aviación.[20] Mencionó que su oficina ha asistido a pilotos, mecánicos o líneas aéreas ante la Federal Aviation Administration (FAA).[21] Explicó que, las reglas de la FAA requieren que cada dos (2) años los pilotos sean evaluados por un instructor para examinar que estén en cumplimiento con las regulaciones de la agencia federal. Manifestó, además que cuenta con una experiencia de 15,000 horas de vuelo como piloto en diferentes tipos de avión.[22] Informó que la FAA lo cualificó como auditor líder ("lead auditor") y lo certificó para que este pudiera renovar las certificaciones de los inspectores y para el adiestramiento, operación y mantenimiento de las líneas aéreas.[23] Por otra parte, atestiguó que cuenta con una serie de licencias de piloto en varias categorías expedidas por la FAA, y nunca le han revocado las mismas.[24] También, comentó que desde el 1994 comenzó a dedicarse más a fondo a las investigaciones de accidentes aéreos y hasta la fecha había trabajado entre sesenta (60) a setenta (70) accidentes tanto en Puerto Rico como en los Estados Unidos o Islas Vírgenes.[25]

En síntesis, enunció que solicitó la documentación pertinente, entrevistó a las partes envueltas, incluyendo al señor **ZAPATA BERRÍOS**, inspeccionó el aeropuerto, y los restos del avión, aseguró que el piloto no fue un factor en el accidente, las condiciones del tiempo tampoco fueron factor determinante del accidente, y el avión sufrió una pérdida de potencia causada porque no llegaba gasolina al motor, toda vez que el filtro de la gasolina estaba contaminado.[26] En su *Informe*, concluyó que el filtro no había sido reemplazado, cambiado o inspeccionado en bastante tiempo, para tener esa cantidad de contaminación y haber tapado el flujo de la gasolina al motor.[27] Por otra parte, testificó que las regulaciones federales requieren que el filtro de la gasolina se verifique visualmente cada 25 horas, luego cada 50 horas, y así sucesivamente, y debía reemplazarse cada 100 horas de vuelo, cosa que no sucedió en este caso.[28] Razonó que en la inspección realizada al avión en el año 2014, surgía que tenía 881.5 horas de vuelo.[29]

---

[20] Transcripción de la Prueba Oral (TPO) de 25 de agosto de 2021, págs. 46- 47.
[21] *Íd.*, págs. 18- 20.
[22] *Íd*., págs. 21- 22.
[23] *Íd*., págs. 38- 40.
[24] Transcripción de la Prueba Oral (TPO) de 25 de agosto de 2021, págs. 42- 43.
[25] *Íd.*, pág. 43.
[26] *Íd.*, págs. 49- 50, 55, 66- 70.
[27] Transcripción de la Prueba Oral (TPO) de 25 de agosto de 2021, pág. 77.
[28] *Íd.*, págs. 91- 93.
[29] *Íd*., pág. 155

Finalmente, concluyó sin duda alguna que la causa más probable del accidente aéreo que resultó en la muerte de RICARDO AGUSTÍN fue la falta de combustible en el motor de la aeronave debido a la contaminación que tenía el filtro que no permitía el paso de la gasolina libremente provocando que fallaran los motores.[30] En el contrainterrogatorio, el señor Irizarry Porrata testificó que en el correo electrónico cursado al señor Gunther Tod, inspector del NTSB, el señor ZAPATA BERRÍOS reconoció que le había instalado una bomba de gasolina, y unos filtros nuevos al avión.[31]

### Testimonio del señor Antonio Zapata Berríos

El señor ZAPATA BERRÍOS en su declaración hizo una sucinta explicación sobre la diferencia entre los dos (2) aviones de los cuales en el pasado había sido dueño registral.[32] Aseguró, además que tuvo el dominio de una nave Rans S12 por dos (2) años aproximadamente y en ese lapso, voló alrededor de 450 horas, realizando siempre un *pre flight check*.[33] Respecto al día de los hechos, el señor ZAPATA BERRÍOS aseveró que llegó alrededor de las 4:00 de la tarde al aeropuerto de Mayagüez y el señor BELTRÁN SÁNCHEZ no había llegado. Sostuvo que el señor BELTRÁN SÁNCHEZ se comunicó y le indicó que había que comprar gasolina para echarle a la nave. Aseguró, que estuvo esperando al señor BELTRÁN SÁNCHEZ alrededor de una (1) hora y fue a buscar cinco (5) galones de gasolina premium a un garaje cerca del aeropuerto de Mayagüez.[34]

Declaró que minutos después llegó el señor BELTRÁN SÁNCHEZ, sacaron los "covers" del avión, y procedieron a montarse. A la vez, indicó que éste le enseñó a prender el radio de comunicaciones y a utilizar los instrumentos para prender el avión. Además, reveló que el señor BELTRÁN SÁNCHEZ no le explicó sobre la bomba de la gasolina, pues el avión que tenía anteriormente era diferente. Comentó que el señor BELTRÁN SÁNCHEZ le comunicó toda esa información dentro del avión y el vuelo de prueba tomó alrededor de 15 a 20 minutos sobrevolando la zona aérea de Cabo Rojo y Hormigueros. Luego regresaron al aeropuerto de Mayagüez y en general calificó el vuelo como uno normal que transcurrió bien.[35] Asimismo, indicó que posteriormente, procedieron a realizar la transacción en las inmediaciones del aeropuerto de $12,000.00 cash y una cámara Canon BG20, con un valor aproximado de $1,600.00.[36] El señor ZAPATA BERRÍOS describió que durante el vuelo de prueba notó al señor BELTRÁN SÁNCHEZ apurado porque este quería ir a ver otro avión en el mismo aeropuerto.[37]

---

[30] Transcripción de la Prueba Oral (TPO) de 25 de agosto de 2021, pág. 165.
[31] *Íd.*, pág. 171.
[32] *Íd.*, págs. 204- 209.
[33] *Íd.*, págs. 209- 210.
[34] Transcripción de la Prueba Oral (TPO) de 25 de agosto de 2021, págs. 215- 218.
[35] *Íd.*, págs. 219– 222.
[36] *Íd.*, págs. 223– 224.
[37] *Íd.*, pág. 225.

Así las cosas, expuso que después de una (1) hora se comunicó con RICARDO AGUSTÍN, su cuñado, para que le acompañara en un vuelo, pues según el señor **BELTRÁN SÁNCHEZ**, este conocía de aviación y en varias ocasiones había compartido con él en otros vuelos. Comunicó que en ese vuelo estuvo volando durante quince (15) a veinte (20) minutos cuando comenzó a perder fuerza en el motor por el área del pueblo de Rincón.[38] Continuó narrando que, al avión perder fuerza comenzó a descender hasta alcanzar una altura de más o menos 75 pies cuando inicialmente, luego del despegue logró alcanzar una altura de unos 1,000 pies.[39]

Exteriorizó, además, que en el interior del avión se escuchaba un ruido raro como si no pudiese responder o no estuviese recibiendo suficiente combustible. Relató que, decidió regresar al aeropuerto de Mayagüez para lograr aterrizar. Empero, que justamente al virar de regreso, la aeronave volvió a perder potencia por lo que, decidió aterrizar bien cerca de la costa entre Añasco y Rincón.[40] Afirmó que, intentó aterrizar lo más lento posible, pero al tocar el agua y el avión ser de tela y no de aluminio se comenzó a hundir rápidamente en cuestión de unos segundos.[41] En relación a RICARDO AGUSTÍN, contó que, al lograr sacarse el cinturón, nadar a la superficie y no verlo, nadó hacia el avión para poder sacarlo hacia la orilla. Especificó que unas personas en "moriboogies" lo ayudaron a llevarlo a la orilla. Cuando intentó darle primeros auxilios ya RICARDO AGUSTÍN no respondía.[42] Durante el contrainterrogatorio del señor **ZAPATA BERRÍOS** concluyó cuando este contestó en la afirmativa que había recibido un correo electrónico en el cual admitió que antes de comprar el avión lo había inspeccionado por fuera por dos (2) horas.[43]

**Testimonio del señor Gerardo Torres Soto**

Comunicó que desde el 1989 es instructor de vuelo y examinador de piloto. Además, mencionó que trabaja para una compañía de seguridad. Divulgó que estudió en la Universidad Interamericana y luego se fue a los Estados Unidos donde alcanzó un título de "*advanced flight instructor*".[44] Después de certificarse y estudiar en diferentes lugares, pudo obtener la certificación de examinador de la Administración Federal de Aviación (*Designated Pilot Examiner* de *FAA* por sus siglas en inglés) por su vasta experiencia en la aviación.[45] De esa manera, confirmó que fue instructor de aviación del señor **BELTRÁN SÁNCHEZ**. Además, contó que tanto él como su padre han tenido negocios relacionados con aviones

---

[38] Transcripción de la Prueba Oral (TPO) de 25 de agosto de 2021, págs. 226-227.
[39] *Íd.*, págs. 227-229.
[40] *Id.*, págs. 229-232.
[41] Transcripción de la Prueba Oral (TPO) de 25 de agosto de 2021, pág. 231.
[42] *Íd.*, págs. 232- 233.
[43] *Íd.*, págs. 253- 255
[44] Transcripción de la Prueba Oral (TPO) de 26 de agosto de 2021, págs. 273- 274.
[45] *Íd.*, págs. 279- 280.

y ensamblado. Afirmó que posee licencia de piloto privado en control aerodinámico.[46]

A preguntas del representante legal del señor **BELTRÁN SÁNCHEZ,** el señor Torres Soto elucidó que una vez un piloto en comando se monta en el avión, es su responsabilidad asegurarse que el pasajero sepa todas las normas de seguridad, lo que va a pasar en el vuelo, como actuar en caso de emergencia y como ponerse el cinturón, entre otras cosas.[47] Respondió que el piloto en comando es la persona que está al mando del vuelo, tiene toda la responsabilidad sobre todo lo que pasa en el avión que va a utilizar, incluyendo el *"pre flight inspection"*, chequeo que se realiza a todo avión antes de cada vuelo.[48] Aseguró que este tipo de aviones experimentales, se acostumbra y se recomienda tener las líneas de gasolina y los filtros en posiciones visibles para que se puedan ver.[49] En su opinión, la distancia entre Mayagüez, Cabo Rojo, Hormigueros ida y vuelta debe tardar mucho más de 15 a 20 minutos, contrario a lo que informó el señor **ZAPATA BERRÍOS**.[50]

El señor Torres Soto atestiguó que el 4 de febrero de 2015, aproximadamente una semana y media antes del lamentable accidente, tuvo la oportunidad de darle el examen al señor Rafael Cortés en el avión del señor **BELTRÁN SÁNCHEZ**, por lo que aseguró que el mismo estaba en perfectas condiciones, como un avión nuevo, así como el filtro estaba excelente y nuevo.[51] Sostuvo que el filtro de la gasolina del avión estaba nuevo y los instrumentos del avión de lo que estaban llenos era de agua y arena como consecuencia del avión haber estado sumergido debajo del mar por tres (3) días.[52] Finalmente, reconoció que el reemplazo del motor, aun cuando las regulaciones establecen que es *"planned and necessary"*, es opcional realizarlo, dependiendo del uso que se le haya dado al mismo.[53]

### Testimonio del señor José Amid Torres González

El señor Torres González informó que es piloto privado desde el 2009, y mecánico *Light-Sport Repairman* para darle mantenimiento a los motores Rotax.[54] Además, cuenta con la certificación de la Rotax, y alrededor de 1,500 horas de vuelo.[55] Atestó que la FAA dispone que para la inspección (*Condition Inspection*) se debe utilizar un *Condition Inspection Checklist*. Según su experiencia con los motores Rotax, expuso que para el mantenimiento puede utilizar las guías de la Rotax, pero que estas no son mandatorias u obligatorias, toda vez que son recomendaciones porque son aviones experimentales y no

---

[46] *Íd.*, págs. 293– 296.
[47] Transcripción de la Prueba Oral (TPO) de 26 de agosto de 2021, págs. 286- 287.
[48] *Íd.*, págs. 315- 316; y 326- 328.
[49] *Íd.*, pág. 317.
[50] *Íd.*, pág. 333.
[51] Transcripción de la Prueba Oral (TPO) de 26 de agosto de 2021, págs. 350- 355; y 361.
[52] *Íd.*, págs. 356- 360.
[53] *Íd.*, págs. 432- 435.
[54] Transcripción de la Prueba Oral (TPO) de 26 de agosto de 2021, pág. 457.
[55] *Íd.*, págs. 459- 460; 464; 467- 468; 471- 472.

certificados.[56] En relación a las horas de uso del avión accidentado, leyó de un documento que tenía 191.5 horas de uso y estaba excedido por unos meses del tiempo de cinco (5) años, a lo que manifestó que el manual de Rotax, en efecto establece que debe repararse el motor a las 300 horas, o a los cinco (5) años, pero que eran recomendaciones. Lo anterior, porque en la práctica y en su experiencia con motores Rotax 582 hay unos que duran más de cinco (5) años, y vuelan sin ningún tipo de problema.[57] Aseguró que en noviembre o diciembre del 2014, voló el avión accidentado en el aeropuerto de Arecibo y estaba en excelentes condiciones.[58]

### Testimonio del señor Miguel Beltrán Sánchez

El señor BELTRÁN SÁNCHEZ relató los hechos del día del accidente, comenzando con que acudió al aeropuerto de Mayagüez para probar el avión que el señor ZAPATA BERRÍOS quería comprarle. Detalló que para el viaje de prueba que realizaron con anterioridad al accidente, el señor ZAPATA BERRÍOS le había indicado que había realizado el *pre flight check*, pero como él acostumbraba a hacerlo, pues lo hizo nuevamente.[59] Especificó que cuando realiza el *pre flight check*, acostumbra a revisar el ala, la cola del avión, los tornillos, los cables, la propela, las mangas, los carburadores, la llave de la gasolina y el filtro de la gasolina.[60] Explicó que el avión consumía aproximadamente de dos (2) galones y medio a tres (3) galones por hora y que luego del vuelo de prueba se quedó con dos (2) galones y medio de gasolina.[61] Reafirmó que ese día, se quedó con los documentos intitulados AROW, los cuales son necesarios para poder volar, y le notificó al señor ZAPATA BERRÍOS que sin ellos no podía volar, pero que aun así él se fue a volar con RICARDO AGUSTÍN, su cuñado.[62] En el contrainterrogatorio, aseguró que nunca voló el avión sin la inspección anual que debía realizarle.[63]

### Testimonio del señor Luis Gerardo Gaud Negrón

El señor Gaud Negrón informó que es técnico mecánico y conocía al señor BELTRÁN SÁNCHEZ porque ambos tenían aviones y compartían con los aviones experimentales que poseían.[64] En síntesis, relató que el día 19 de febrero de 2015, se encontraba en el aeropuerto y vio al señor ZAPATA BERRÍOS entrar con unos galones de gasolina, se los echó y le preguntó que, si iba a volar, a lo que él respondió que no por las condiciones del tiempo.[65] Luego, comprobó que dos semanas antes del accidente, voló el avión y se encontraba en excelentes

---

[56] *Íd.*, págs. 482- 483

[57] Transcripción de la Prueba Oral (TPO) de 26 de agosto de 2021, págs. 487- 489; 495- 496; 527.
[58] *Íd.*, págs. 505- 506.
[59] Transcripción de la Prueba Oral (TPO) de 27 de agosto de 2021, págs. 549- 551.
[60] *Íd.*, págs. 552.
[61] *Íd.*, págs. 556- 557.
[62] *Íd.*, págs. 558- 563; 578.
[63] Transcripción de la Prueba Oral (TPO) de 27 de agosto de 2021, pág. 576.
[64] *Íd.*, pág. 602.
[65] *Íd.*, págs. 603- 605.

condiciones. Además, aseveró que el filtro del avión accidentado, en efecto, se encuentra en la parte izquierda donde está el piloto en comando, y era un filtro normal, excelente.[66]

### Testimonio del señor Roberto Colón Mercado

El señor Colón Mercado declaró que ofrece mantenimiento a automóviles, y conocía al señor **BELTRÁN SÁNCHEZ** porque hacían grupos para volar en el aeropuerto de Mayagüez.[67] Afirmó que el 25 de enero de 2015, voló el avión accidentado y aseguró que la condición del avión estaba totalmente excelente, con tornillería nueva, cables, relojes, mangas, precintas, filtro de gasolina y controles. A su vez, realizó un *pre flight check* y notó que el filtro estaba totalmente nuevo.[68]

### Testimonio del señor Félix Cruz Despiau

El señor Cruz Despiau fue cualificado como perito de ocurrencia en mecánica de aviación.[69] Refrendó que el avión experimental puede tener las horas de uso que sean, y no necesariamente requiere que se le haga una inspección con la frecuencia que disponen las regulaciones.[70] Detalló que el 26 de noviembre de 2014, realizó una inspección al avión RANS S6 Coyote, el avión estaba en muy buenas condiciones y no encontró discrepancia alguna. A su vez, que el filtro se le había cambiado y tenía uno nuevo.[71]

Evaluado concienzudamente el expediente del caso; contando con el beneficio de la comparecencia de ambas partes; y habiendo examinado minuciosamente la transcripción de la prueba oral estipulada, nos encontramos en posición de adjudicar. Puntualizamos las normas de derecho pertinentes a la(s) controversia(s) planteada(s).

### - II -

### - A - *Apreciación de la Prueba*

Cuando se evalúa la *apreciación de la prueba* desfilada ante el Tribunal de Primera Instancia, como regla general, se le reconoce amplia deferencia a las determinaciones de hechos que formula el honorable Juez de instancia.[72]

En esa misma dirección, es menester fundamentar que la Regla 42.2 de las de Procedimiento Civil de 2009 instituye que las determinaciones de

---

[66] *Íd.*, págs. 617- 620.
[67] Transcripción de la Prueba Oral (TPO) de 27 de agosto de 2021, págs. 644- 646.
[68] *Íd.*, págs. 648- 650.
[69] *Íd.*, págs. 680- 681.
[70] Transcripción de la Prueba Oral (TPO) de 27 de agosto de 2021, págs. 689- 690.
[71] *Íd.*, págs. 697- 698; 713.
[72] Véase: Luis Rivera Román, *La Apreciación de Prueba en el Tribunal de Primera Instancia y en el Tribunal de Apelaciones, Perspectivas en la Práctica Apelativa*, Ediciones Situm 2018, pág. 91.

hechos que contempla el foro de instancia a base de testimonios orales "no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de las personas testigos".[73]

De igual manera, la Regla 110 de Evidencia instaura que "será el juzgador de hechos quien deberá evaluar la prueba presentada con el propósito de determinar cuáles hechos fueron establecidos o demostrados".[74] Así pues, es norma reiterada que cuando se le solicita a un foro apelativo que revise [determinaciones] de hechos, la *apreciación de la prueba*, en primer lugar, le corresponde al tribunal sentenciador ya que estos tienen la oportunidad de observar y oír a los testigos, y por ello, están en mejor posición de evaluarla.[75] En ese sentido, la evaluación del foro sentenciador merece respeto y deferencia.[76]

Cónsono con ello, por lo general, "los tribunales apelativos no intervenimos ni alteramos innecesariamente las determinaciones de hechos que hayan formulado los tribunales de primera instancia luego de admitir y aquilatar la prueba presentada durante el juicio".[77] Es decir, no debemos descartar las determinaciones "tajantes y ponderadas del foro de instancia" y sustituirlas por nuestra propia apreciación, a base de un examen del expediente del caso.[78]

Ahora bien, la deferencia al juicio del juzgador de hechos "no es absoluto" pues "[u]na apreciación errónea de la prueba no tiene credenciales de inmunidad" frente a nuestra facultad revisora.[79] Los foros apelativos podremos intervenir con la *apreciación de la prueba* cuando exista error manifiesto, pasión, prejuicio, parcialidad o cuando un análisis integral,

---

[73] 32 LPRA Ap. V, R. 42.2.
[74] 32 LPRA Ap. VI, R. 110.
[75] Luis Rivera Román, *op. cit.*, págs. 92– 93. Véase, además: *Pueblo v. Acevedo Estrada*, 150 DPR 84, 98-99 (2000); *López Vicil v. ITT Intermedia, Inc.*, 142 DPR 857, 865 (1997).
[76] *González Hernández v. González Hernández*, 181 DPR 746, 776 (2011).
[77] *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 65 (2009).
[78] *Íd.*, págs. 65- 66.
[79] *Ramos Acosta v. Caparra Dairy, Inc.*, 113 DPR 357, 365 (1982); *Vda. de Morales v. De Jesús Toro*, 107 DPR 826, 829 (1978).

detallado y minucioso de la prueba así lo justifique.[80] Ello sin olvidar que "la intervención indiscriminada con la adjudicación de credibilidad que se realiza a nivel de instancia significaría el caos y la destrucción del sistema judicial existente en nuestra jurisdicción".[81]

Respecto al prejuicio, pasión o parcialidad, existen si el juzgador "actúa movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna".[82] Conforme a ello, se consideran erróneas las conclusiones del [tribunal] apelado, si de un análisis de la totalidad de la prueba, el foro apelativo entiende que esta se distancia de la realidad fáctica o es inherentemente imposible o increíble.[83] Por lo tanto, el juez debe evitar cualquier distracción de alcanzar conclusiones tempranas durante la presentación de la prueba y debe aguardar con paciencia hasta escuchar la prueba de la parte adversa, para luego determinar los hechos esenciales del caso.[84]

Con ese propósito, la tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada, lo cual incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz.[85] En consonancia, los tribunales apelativos no intervendremos con la *apreciación de la prueba*, la adjudicación de credibilidad y las determinaciones de hechos que realizan los tribunales de instancia, a menos que se demuestre que el juzgador actuó movido por pasión, prejuicio o parcialidad o que incurrió en error manifiesto.[86] Cuando la alegación es de pasión, prejuicio o parcialidad, los foros apelativos debemos verificar

---

[80] *Pueblo v. García Colón I*, 182 DPR 129 (2011); *González Hernández v. González Hernández, supra*, pág. 777.
[81] *Pueblo v. Toro Martínez*, 200 DPR 834, 859 (2018).
[82] *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 782 (2013).
[83] *Pueblo v. Irizarry*, 156 DPR 780, 816 (2002).
[84] Luis Rivera Román, *op. cit.*, pág. 94.
[85] *Gómez Márquez et al. v. El Oriental*, 203 DPR 783 (2020).
[86] *Íd.*

primordialmente si el juez de primera instancia cumplió su función de adjudicar de manera imparcial, pues solo así podremos descansar en sus determinaciones de hechos.[87]

### - B - *Artículo 1802 del Código Civil de Puerto Rico de 1930*

El Artículo 1802 del Código Civil de Puerto Rico de 1930 implanta que la persona que por acción u omisión causa daño a otra, interviniendo culpa o negligencia, viene obligada a reparar el daño causado.[88] Todo perjuicio, material o moral, da lugar a reparación si concurren estos tres (3) elementos: (1) un acto u omisión culposo o negligente; (2) el daño sufrido; y (3) la existencia de un nexo causal entre el daño y la acción u omisión.[89] Por lo que, este precepto constituye la fuente de las acciones torticeras derivadas de *muerte ilegal* que en nuestro derecho son dos (2): (1) la acción personal de la víctima inicial del accidente por los daños que ella misma sufrió; y (2) la acción que corresponde exclusivamente y por derecho propio a los parientes próximos de la persona fallecida por los daños que a ellos causa la muerte de un ser querido.[90] Cuando los sucesores de la víctima original ejercitan ambas causas de acción, estas pueden diferenciarse llamando a la primera la acción heredada o patrimonial; y a la otra la acción directa o personal. "En realidad se trata de causas de acción esencialmente distintas e independientes porque tienden a la reparación de perjuicios diferentes".[91]

Mediante la acción personal se procura compensar el perjuicio material y moral que causa la *muerte ilegal* a aquellas personas vinculadas a la finada por lazos de parentesco, afecto y cariño.[92] Los daños morales pueden refluir sobre varias personas, y en tal caso cada una adquiere una acción

---

[87] *Íd.*

[88] 31 LPRA. § 5141. El Código Civil de Puerto Rico de 1930 fue derogado y sustituido por el Código Civil de Puerto Rico de 2020, conocido como la Ley Núm. 55-2020, según enmendada, 31 LPRA § 5311 et seq. No obstante, los hechos del caso de autos que originan la presente controversia tomaron lugar durante la vigencia del código anterior, por lo cual esta es la ley que aplica al caso.

[89] *González Cabán v. JR Seafood et al.*, 199 DPR 234 (2017); *Rivera v. S.L.G. Díaz*, 165 DPR 408 (2005); *Hernández Nieves v. Fournier*, 80 DPR 93, 97 (1957).

[90] *Santiago Montañez v. Fresenius Medical*, 195 DPR 476 (2016); *Figueroa Vda. de Delgado v. Boston Insurance Company*, 101 DPR 598, 599-600 (1973).

[91] *Cintron Adorno v. Gómez*, 147 DPR 576 (1999); *Caez v. United States Casualty Company*, 80 DPR 754, 760 (1958).

[92] *Hernández Nieves v. Fournier, supra*, pág. 97.

independiente contra el causante de la *muerte ilegal*.[93] "Debe exigirse a cada demandante que justifique cumplidamente la realidad de los daños que alega. Así, en cuanto a los daños morales es imprescindible probar sufrimientos y angustias morales profundas y no bastaría una pena pasajera como base de la acción".[94]

Es de usual conocimiento que en nuestro estado de derecho el elemento de previsibilidad está estrechamente relacionado no tan solo al elemento negligencia sino también a la causalidad.[95] Así pues, esta doctrina dispone que el daño podrá ser considerado "como el resultado probable y natural de un acto u omisión negligente, si luego del suceso, este parece ser la consecuencia razonable y común de la acción u omisión de que se trate".[96]

De otro lado, la *prescripción* es una figura jurídica que opera para extinguir un derecho debido a que una parte no lo ejerce dentro de un período determinado por ley.[97] Las acciones para exigir responsabilidad civil por las obligaciones derivadas de la culpa o negligencia prescriben por el transcurso de un (1) año desde que lo conoció el agraviado.[98] Así pues, esta norma se fundamenta en lo que en nuestro ordenamiento se conoce como la teoría cognoscitiva del daño. Según esta, "el término prescriptivo para exigir responsabilidad por un daño extracontractual comienza a transcurrir cuando el perjudicado conoció —o debió conocer de haber procedido diligentemente— la existencia del daño, quién lo causó, así como los elementos necesarios para ejercer efectivamente la causa de acción".[99]

Así, trascurre la prescripción para las acciones derivadas de la *muerte ilegal*. El término prescriptivo para ejercitar la causa de acción personal de los allegados del difunto comienza a la fecha del fallecimiento.[100]

---

[93] *Id.*, págs. 97-98.
[94] *Id.*, pág. 103.
[95] *Sucn. Mena Pamias et al. v. Meléndez et al.*, 212 DPR 758, (2023) *Nieves Díaz v. González Massas*, 178 DPR 820, 845 (2010).
[96] *Santiago v. Sup. Grande*, 166 DPR 796, 818 (2006).
[97] *Rivera Muñiz et al. v. Mun. de Ponce et al.*, 196 DPR 410, 415 (2016).
[98] Artículo 1868 del Código Civil de 1930, 31 LPRA § 5298.
[99] *Maldonado Rivera v. Suárez*, 195 DPR 182, 212 (2016).
[100] *Caez v. United States Casualty Company, supra*, pág. 761.

Dentro del marco jurídico antes enunciado, procedemos a resolver la(s) controversia(s) planteada(s.)

- III -

En su recurso, el señor **TORRES CARDONA Y OTROS** sostienen que el foro de instancia incidió al descartar el informe rendido por la NTSB que determinó que el filtro de la gasolina del avión accidentado estaba contaminado; al descartar la opinión pericial del señor Luis Irizarry Porrata, quien concluyó que la causa probable del accidente fueron las omisiones negligentes del señor **BELTRÁN SÁNCHEZ** al incumplir sus obligaciones como dueño de mantener el avión en condiciones aptas; y al decidir que el accidente de aviación ocurrió por la negligencia y/o las omisiones negligentes del señor **ZAPATA BERRÍOS.**

Esto es, entienden que la causa más próxima del lamentable accidente que costó la vida de RICARDO AGUSTÍN fue el alegado incumplimiento y las omisiones del señor **BELTRÁN SÁNCHEZ** con el mantenimiento y cuidado del avión que se encontraba bajo su nombre registral. Argumentan que el desafortunado desenlace se debió al dolo o engaño por parte del señor **BELTRÁN SÁNCHEZ** al señor **ZAPATA BERRÍOS** al no proveer el mantenimiento adecuado del filtro de gasolina del avión, lo que restringió el flujo de gasolina al motor y provocó la muerte de RICARDO AGUSTÍN. Aseguran que el foro de instancia descartó la opinión del señor Luis Irizarry Porrata, único perito cualificado como experto en investigación y reconstrucción de accidentes aéreos, así como el *Informe Factual* realizado por el *National Transportation Safety Board* admitido en evidencia por estipulación de las partes. Aducen que lograron establecer, mediante preponderancia de la prueba, que el accidente ocurrió por la negligencia exclusiva del señor **BELTRÁN SÁNCHEZ**. Finalmente, expusieron que la *Sentencia Enmendada* apelada descartó, sin base racional alguna, la evidencia incontrovertida, no rebatida por el señor **BELTRÁN SÁNCHEZ**, que demostró que la contaminación del filtro fue una

determinación que hicieron los investigadores del *National Transportation Safety Board.*

Por su parte, el señor **BELTRÁN SÁNCHEZ** expuso que el señor **ZAPATA BERRÍOS** informó al agente del *FAA* que el avión tenía filtros nuevos cuando lo inspeccionó antes de salir a volar con **RICARDO AGUSTÍN**, su cuñado, y tal expresión es contraria a su testimonio en corte, donde atestiguó que no pudo inspeccionar el avión porque tenía cerraduras. Así, aseguró que el filtro del avión estaba al día en el momento en que se montaron en el avión que eventualmente culminó en el lamentable accidente. Añadió, que el señor **TORRES CARDONA Y OTROS** intentaron comprobar que el filtro no fue cambiado pasadas las 100 horas de vuelo del avión, sin embargo, enfatiza que el cambio o "chequeo" del avión al que se refieren los manuales corresponde exclusivamente a los aviones de uso comercial. Por lo anterior, sostuvo que el testigo Félix Cruz Despiau, perito mecánico de aviación, testificó que el avión objeto del accidente era uno experimental, por lo que, podían volar hasta 200 horas y solo requería una inspección anual, datos que no fueron impugnados por el señor **TORRES CARDONA Y OTROS**. Puntualizó que el avión fue inspeccionado el 25 de noviembre de 2014, por un mecánico certificado, y la compraventa se efectuó dos meses y medio después, el 19 de febrero de 2015, de manera que era prudente estimar que el avión estaba recién inspeccionado de conformidad con las regulaciones federales del *FAA*. Veamos.

De una lectura del *Escrito de Apelación* se desprende que los errores señalados se circunscriben a los aspectos de la apreciación de la prueba desfilada. Por lo tanto, discutiremos conjuntamente los señalamientos de error esbozados.

De la Transcripción de la Prueba Oral (TPO) trasciende que, el señor **ZAPATA BERRÍOS** aseguró, que estuvo esperando al señor **BELTRÁN SÁNCHEZ** alrededor de una (1) hora y fue a buscar cinco (5) galones de gasolina

premium a un garaje cerca del aeropuerto de Mayagüez.[101] Luego, se dirigió al área donde estaban los demás aviones en el aeropuerto, y allí realizó la mezcla de gasolina con aceite Pennzoil.[102] Declaró que minutos después llegó el señor **Beltrán Sánchez**, sacaron los "covers" del avión, y procedieron a montarse. Comentó que el vuelo de prueba tomó alrededor de quince (15) a veinte (20) minutos sobrevolando la zona aérea de Cabo Rojo y Hormigueros. Más tarde, regresaron al aeropuerto de Mayagüez y en general calificó el vuelo como uno normal que transcurrió bien.[103] Así las cosas, expuso que después de una (1) hora se comunicó con Ricardo Agustín, su cuñado, para que le acompañara en un vuelo. Atestiguó que en ese vuelo estuvo volando durante quince (15) a veinte (20) minutos cuando comenzó a perder fuerza en el motor por el área del pueblo de Rincón.[104] No obstante, en el contrainterrogatorio, el señor **Zapata Berríos** se contradijo cuando respondió que compró cinco (5) galones de gasolina, cuando en la narración a los inspectores de la *FAA* exteriorizó que salió en el vuelo con dieciocho (18) galones de gasolina.[105]

Asimismo, el señor **Zapata Berríos** intentó demostrar que el señor **Beltrán Sánchez** le vendió una aeronave y, por tanto, debe responder por los daños y perjuicios resultantes ante el lamentable incidente en el que falleció Ricardo Agustín, su cuñado. Para ello, contrató los servicios del señor Irizarry Porrata, perito de aviación, quien declaró y concluyó que la causa más probable del accidente aéreo fue la falta de combustible en el motor de la nave. Esto, debido a la contaminación que tenía el filtro del tanque de combustible que no permitía el paso libremente de la gasolina, haciendo que fallaran los motores.[106] Es preciso señalar que en su testimonio, el señor Irizarry Porrata reveló que como parte de su investigación, tuvo conocimiento de un correo electrónico dirigido al señor Gunter Tod,

---

[101] Transcripción de la Prueba Oral (TPO) de 25 de agosto de 2021, págs. 215- 218.
[102] *Íd.*, pág. 218.
[103] *Íd.*, págs. 219– 222.
[104] Transcripción de la Prueba Oral (TPO) de 25 de agosto de 2021, págs. 226- 227.
[105] *Íd.*, pág. 249.
[106] *Íd.*, págs. 163– 165.

inspector de la NTSB, en el cual se le preguntó al señor **ZAPATA BERRÍOS** lo siguiente: "*Did the airplane have any fuel [p]umps installed?*, a lo que éste respondió "*Yes, a new fuel filters*".[107]

Con respecto a la licencia del señor **ZAPATA BERRÍOS**, el señor IRIZARRY PORRATA narró que hubo un evento el 8 de enero de 2015, apenas treinta y cinco (35) días antes del accidente en Isla Grande, en violación a una disposición de la ley que establece que "ninguna persona podrá operar una nave *in a careless*, o *reckless manner*".[108] A su consideración, dicha situación no era relevante o importante para el presente caso.[109] Por su parte, el señor TORRES SOTO, atestó que a base de su experiencia como examinador del *FAA*, la situación previa del señor **ZAPATA BERRÍOS** trataba de una acción conocida como *pilot deviation*.[110] Es decir, cuando un piloto se desvía de las regulaciones cometiendo una falta negligente y de manera temeraria.[111] En su opinión, el accidente ocurrido con RICARDO AGUSTÍN, se trató de un acto de descuido y negligencia temeraria.[112]

De otro lado, el señor **BELTRÁN SÁNCHEZ** quiso alejarse de la responsabilidad civil que se le imputa, al declarar que el señor **ZAPATA BERRÍOS** estuvo dos (2) horas antes del vuelo de prueba en el aeropuerto de Mayagüez; y el señor **ZAPATA BERRÍOS** fue negligente al no haber realizado un *pre flight check* momentos antes de despegar junto a RICARDO AGUSTÍN hacia Rincón. Esencialmente, el señor **BELTRÁN SÁNCHEZ** explicó que un *pre flight check* consiste en verificar toda la cabina de la nave incluyendo las alas, las mangas y el tanque de combustible. Insistió en que, de haber cumplido con ese requisito requerido por la *FAA*, el incidente con mayor probabilidad no hubiera ocurrido.[113] Apuntaló sobre el día del vuelo de prueba:

---

[107] Transcripción de la Prueba Oral (TPO) de 25 de agosto de 2021, pág. 171.
[108] *Íd.*, pág. 176- 177.
[109] *Íd.*, págs. 177- 178.
[110] Transcripción de la Prueba Oral (TPO) de 25 de agosto de 2021, pág. 346.
[111] *Íd.*
[112] *Íd.*, pág. 348.
[113] Véase Code of Federal Regulations, Title 14, Chapter I, Subchapter A, Part 5: https://www.ecfr.gov/current/title-14/chapter-I/subchapter-A/part-5. Transcripción de la Prueba Oral (TPO) de 27 de agosto de 2021, págs. 550– 554.

"Que me acuerdo yo, llegamos a Cabo Rojo y para ese tiempo, pues había una poquita de lluvia, estaba el tiempo como medio... En Mayagüez se pone el tiempo de momento como malo, como yo digo, malo. Entonces, vi un... íbamos por Cabo Rojo y yo vi un... como un aguacerito que venía por el Cerro Las Mesas y le dije, le dije: "Antonio, mira el aguacero que viene ahí, vira." Le dije: "Vira, porque esto no es el Cessna que vuela como... esto no es el Cessna tuyo que vuela rápido, esto es un avión liviano, es de tela y..." Me dice: "¿Qué, tienes miedo, pendejo?" Yo le dije: "No es miedo, es precaución porque no me gusta volar con tiempo malo", y todos ellos lo sabían."[114]

Para sostener sus alegaciones, el señor **BELTRÁN SÁNCHEZ** presentó varios testigos y peritos para mostrar que no actuó de manera negligente y los actos del señor **ZAPATA BERRÍOS** fueron la causa del accidente.

Por su parte, el señor GERARDO TORRES SOTO, contratista, inspector de vuelo y examinador de la *FAA*, quien fue cualificado como perito en el ámbito de aviones ultralivianos, manifestó lo siguiente:

Una vez nos montamos en el avión es responsabilidad del piloto – en – comando...asegurarse de que todo esté bien y asegurar que el pasajero... [sepa] todas las normas de seguridad, todo lo que va a pasar en el vuelo... y [explique] cómo, cómo actuar en caso de una emergencia; como ponernos el cinturón, como soltarnos el cinturón. Todas las cosas que pueden suceder en un vuelo... [d]e ahí partimos a la parte del vuelo y en la parte de vuelo, pues nosotros verificamos absolutamente todo en esa persona, desde los despegues, diferentes tipos de despegue, diferentes tipos de aterrizaje, aeronavegamos... y hacemos maniobras de aire... que son maniobras que se practican para emergencias.[115]

El señor TORRES SOTO relató que el 4 de febrero de 2015, aproximadamente una semana y media antes del lamentable accidente, tuvo la oportunidad de darle el examen al señor Rafael Cortés en el avión del señor **BELTRÁN SÁNCHEZ**, por lo que aseguró que el mismo estaba en perfectas condiciones, como un avión nuevo, así como el filtro estaba excelente y nuevo.[116] Precisamente, manifestó que:

P ¿Dónde tenía el filtro de gasolina ese avión?
TORRES SOTO: El filtro de ese avión lo tenía en el piso del avión pegado, mas o menos quedaba en el lado del piloto, izquierdo, mas o menos a la altura del... a la altura de la batata, de la pierna, visible.
P ¿Por qué?
TORRES SOTO: Nosotros en la, en la aviación deportiva, los ultralivianos, aviones experimentales y eso, a diferencia de los Cessna o aviones certificados que todo está escondido, en estos aviones todo está expuesto. Y siempre los filtros de gasolina y eso

---

[114] Transcripción de la Prueba Oral (TPO) de 27 de agosto de 2021, págs. 554- 555.
[115] Transcripción de la Prueba Oral (TPO) de 26 de agosto de 2021, págs. 283- 287.
[116] *Íd.*, págs. 350- 355; y 361.

lo ponemos en un lado que sea bien accesible para, para poder verlos y si hay que cambiarlos, pues cambiarlos fácilmente. No los ponemos en lugares escondidos. So, esta bien accesible.

P ¿En qué condiciones está... ¿Cuándo fue eso, de nuevo?

TORRES SOTO**:** Febrero 4.

P Febrero 4. Okey. ¿Y en qué condiciones estaba ese filtro en febrero 4 cuando usted hizo esa examinación de ese estudiante?

TORRES SOTO**:** Estaba excelente.

P Bien.

TORRES SOTO: Estaba limpio, como nuevo.[117]

De igual forma, declaró que los libros de mantenimiento del avión no mostraron ningún tipo de irregularidad y estaban acorde con las regulaciones del *FAA*.[118] Análogamente, los demás declarantes presentados por el señor **BELTRÁN SÁNCHEZ** ratificaron que el avión accidentado, unas semanas antes estaba en buenas condiciones, con ningún reporte de desperfectos y/o problemas, e incluso con un filtro en perfectas condiciones.

A su vez, el señor JOSÉ AMID TORRES GONZÁLEZ constató que el filtro del avión se veía a simple vista, porque se encontraba en el lado del piloto y se apreciaba que era nuevo.[119] Del mismo modo, el señor LUIS GERARDO GAUD NEGRÓN comprobó que dos (2) semanas antes del accidente ocurrido, voló el antedicho avión; se encontraba en excelentes condiciones; y el filtro del avión

---

[117] Transcripción de la Prueba Oral (TPO) de 26 de agosto de 2021, págs. 353- 354.

[118] *Íd*., pág. 367.

> P ... en cuanto al mantenimiento del motor, mantenimientos de fuselaje y ...?
>
> TORRES SOTO: Ellos estaban... los libros y las firmas y todo estaban, estaban de acorde a las regulaciones.
>
> P ¿Al Federal Aviation Regulation?
>
> TORRES SOTO: Si.
>
> P O sea, ¿Usted no encontró ninguna irregularidad en los libros de mantenimiento de ese avión?
>
> TORRES SOTO: No. Bajo lo que nosotros miramos, no.

[119] *Íd*., pág. 502. El señor TORRES SOTO declaró lo siguiente:

> TORRES GONZÁLEZ: Okey. Pues recuerdo porque se veía a simple vista el filtro. Estaba hacia el lado izquierdo, perdón, del lado del piloto y se veía fácil. Se veía que era nuevo.
>
> P ¿Que se... Cuándo fue que usted dice que, que... Cuándo fue que usted dice que recuerda ese filtro y que se veía que era nuevo?
>
> TORRES GONZÁLEZ: Eso fue, eso fue en el aeropuerto de Arecibo. Porque Miguel Beltrán, pues voló de Mayagüez hacia Arecibo y ahí fue que me mostró el avión, que lo vi cuando estaba recién pintado, reparado.
>
> P Okey. Y...
>
> **Hon. Juez Miguel Deynes Vargas**: ¿Para que fecha?
>
> TORRES GONZÁLEZ: Mas o menos, noviembre-diciembre del 2014, aproximadamente.

accidentado se encontraba en el lado izquierdo del piloto en comando, en excelentes condiciones.[120]

Es de notar, que de la Transcripción de la Prueba Oral (TPO) surge específicamente que el señor IRIZARRY PORRATA declaró que el filtro estaba localizado a mano izquierda, en el fuselaje, en la parte de abajo donde está sentado el piloto.[121] Por ello, podemos colegir razonablemente que el señor ZAPATA BERRÍOS, antes de emprender su vuelo con RICARDO AGUSTÍN, entre otras cosas, debió asegurarse de verificar el filtro y cerciorarse que no estuviese obstruido y/o contuviese alguna partícula que pudiese afectar su desempeño o función, como parte del *pre flight check*, responsabilidad que tenía como piloto en comando.

Más aún, del testimonio del señor BELTRÁN SÁNCHEZ sobre lo acontecido en el día de los hechos, manifestó que retuvo los documentos intitulados AROW, los cuales eran necesarios para poder volar, y le notificó al señor ZAPATA BERRÍOS que sin ellos no podía volar, pero aun así él se dirigió al avión con RICARDO AGUSTÍN.[122] Ello denota desidia por parte del señor ZAPATA BERRÍOS, pues en primer lugar no debió volar el avión recién comprado sin la documentación necesaria.

Recordemos que el foro sentenciador es quien está en mejor posición para aquilatar la prueba desfilada y evaluar cabalmente las declaraciones

---

[120] Transcripción de la Prueba Oral (TPO) de 27 de agosto de 2021, págs. 617- 620.
> P Si, si, vamos, vamos… Si, en ese tiempo… Si, vamos con calma ahora. ¿En ese tiempo, en ese tiempo para el cual usted acaba de testificar que volaba el avión, que eran dos semanas antes del accidente; en que condición usted recuerda que estaba el avión?
> GAUD NEGRÓN: En excelentes condiciones, porque cuando, cuando yo volaba con él, yo siempre me paso mirando los relojes y…
> […]
> P ¿Dónde se encontraba el filtro de gasolina de ese avión?
> GAUD NEGRÓN: Ese avión… el filtro de gasolina se encuentra en la parte izquierda donde esta el piloto en comando.
> […]
> P ¿Y, y en esa descripción que usted nos hace que usted miraba los relojes, miraba todo; que recuerdos tiene usted sobre ese filtro de gasolina?
> GAUD NEGRÓN: Un filtro normal y créame que para yo montarme en una nave ajena, créame que yo tengo que mirarla de rabo a cabo.

[121] *Íd.*, pág. 81.
[122] *Íd.*, págs. 558- 563; y 578.

vertidas por los testigos ante su consideración.[123] Por ello, en el ejercicio de nuestra función revisora, merece que le otorguemos deferencia al foro *a quo* en cuanto a su adjudicación de credibilidad y valor probatorio. Además, en ausencia de que el tribunal primario haya incurrido en pasión, perjuicio, parcialidad o error manifiesto, resolvemos validar la apreciación de la prueba del juzgador.

**- IV -**

Por los fundamentos antes expuestos, **confirmamos** la *Sentencia Enmendada* prescrita el 1 de marzo de 2023 por el Tribunal de Primera Instancia, Sala Superior de Aguada.

**Notifíquese inmediatamente.**

Lo acordó el Tribunal y lo certifica la Secretaría del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[123] *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219– 220 (2021); *Hernández Maldonado v. Taco Maker,* 181 DPR 281 (2011).